## COMMONWEALTH *vs.* CARLOS MALDONADO.

Suffolk. September 10, 2013. - January 8, 2014.

Present: IRELAND, C.J., CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Constitutional Law,* Jury, Public trial. *Practice, Criminal,* Public trial, Sequestration of witnesses, Transcript of testimony before grand jury, Hearsay, Jury and jurors, Capital case. *Evidence,* Conflicting statements of witness, Contradiction of witness, Credibility of witness, Explanation of previous testimony, Hearsay, Testimony before grand jury. *Witness,* Explanation of previous testimony, Credibility, Intimidation. *Intimidation of Witness. Jury and Jurors.*

At a murder trial, the judge's order requiring all spectators to sign and present a source of identification before entering the court room, and barring all persons on the witness list did not violate the defendant's right to a public trial under the Sixth Amendment to the United States Constitution, where the conditions imposed on entry into the court room did not rise to the level of a constitutional closure. [747-751]

Statement exercising this court's supervisory power to preserve the presumption of openness of court rooms even where a restriction imposed on access falls short of a constitutional closure, wherein the presumption that spectators should be free to enter a court room in which a criminal case against an adult is being adjudicated without first having to show identification or to provide one's name may be overcome and identification may be required of spectators only where a judge sets forth on the record the reasons that justify imposition of this condition based on the special circumstances of the case and only where the conditions are no broader than needed to accomplish their purpose, in that an articulable risk of witness intimidation or court room disruption must warrant imposition of this condition on entry; further, any party may seek interlocutory review of such an order by a single justice. [751-754]

At a murder trial, there was no error in the admission in evidence without limitation of the grand jury testimony of a witness whose trial testimony contradicted his grand jury testimony such that the judge found the witness was feigning a loss of memory, where the judge was not required to conduct voir dire of the witness, in that the direct and cross-examination provided a sufficient basis for the judge's evidentiary determination [754-755]; and where the evidence supported the judge's finding that the witness's grand jury testimony was not coerced [755-756].

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the prosecutor's questioning of a witness for the Commonwealth that elicited a hearsay statement that another individual had seen the defendant shoot the victim, where the witness's testimony was consistent with the

defense, and where, even if the jury had ignored the limiting instruction and considered the hearsay statement for its truth, the prosecution's case did not rest heavily on the hearsay declarant's credibility and there was much other compelling evidence that the defendant was the lone shooter. [757-759]

There was no error in the denial of a criminal defendant's motion for a new trial claiming that the judge's failure to conduct voir dire of other jurors after the judge conducted voir dire of an individual juror who sent a question to the judge concerning the safety of jurors in a gang-related trial and the availability of their addresses to the defendant, where the individual juror's mistaken belief was not extraneous information posing a substantial risk of prejudice arising from an extraneous influence on the jury, the judge was satisfied that the individual juror remained fair and impartial, and none of the other jurors shared the juror's concern when she had discussed it with them. [760-762]

INDICTMENTS found and returned in the Superior Court Department on March 13, 2007.

The cases were tried before *Thomas E. Connolly*, J., and a motion for a new trial was considered by him.

*Chauncey B. Wood* for the defendant.

*Teresa K. Anderson*, Assistant District Attorney (*David S. Fredette*, Assistant District Attorney, with her) for the Commonwealth.

GANTS, J. A Superior Court jury convicted the defendant of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, in violation of G. L. c. 265, § 1, for the killing of Mark Parilla.[1] The defendant raises four issues on appeal. First, he argues that his right to a public trial under the Sixth Amendment to the United States Constitution was violated by what he characterizes as a closure of the court room arising from the judge's order to require all spectators attending the trial to sign in and show identification. Second, he contends that the judge erred by admitting in evidence the grand jury testimony of a prosecution witness without complying with the requirements set forth in *Commonwealth* v. *Daye*, 393 Mass. 55 (1984). Third, he claims that the admission in evidence of prejudicial and inadmissible hearsay that one prosecution witness told another prosecution witness that he had seen the defend-

---

[1]The jury also convicted the defendant of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (*a*).

ant shoot the victim created a substantial likelihood of a miscarriage of justice. Fourth, he argues that the judge violated his Sixth Amendment right to be tried by an impartial jury by failing to conduct a voir dire of all the jurors after one juror expressed concern that the defendant had access to the juror's address in the juror's confidential questionnaire. For the reasons detailed below, we affirm the defendant's convictions and the denial of his motion for a new trial.[2] After a complete review of the record, we decline to exercise our plenary authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder conviction to a lesser degree of guilt.

*Background.* Because the defendant does not challenge the sufficiency of the evidence at trial, we briefly summarize it, reserving certain details of the trial for our discussion of the alleged errors.

The defendant, also known as "Braveheart," was a member of the Charlestown "Bloods" gang and often stayed in an apartment on Walford Way with his step-grandmother in the Bunker Hill housing development in the Charlestown section of Boston. The victim was from New York and was a member of the Bloods in New York, but was not a member of the Charlestown Bloods. He had moved to Boston a few months before his death and resided with Travon Hector, who was a member of the Charlestown Bloods.

At approximately 4:30 P.M. on December 26, 2006, Hector had a heated argument about the victim with Ersy Herrera, Jose Rivera, Joey Bosquet, and others (but not the defendant), where the victim was accused of being a "snitch." Hector defended the victim and said he would come back with him and fight them. After the argument ended, those who had confronted Hector returned to the apartment building on Walford Way. A blue pickup truck that the defendant usually drove was parked in front.[3] They saw the defendant outside and told him about the argument with Hector and the accusation that the victim was an informant. The defendant said that the victim was a "snitch" and that there was "drama" between him and the victim. The

---

[2]The defendant's appeals from his convictions and the denial of his motion for a new trial have been consolidated.

[3]The pickup truck was owned by the defendant's brother.

defendant went to his second-floor apartment, and returned with a firearm, which he displayed to the others, saying, "I got something for that snitch."

Meanwhile, Hector had returned home to get the victim, and each armed with a knife, they walked to the apartment building, arriving shortly after the defendant had retrieved the firearm. Once they arrived, they were directed to the area known as the "cut" in the back of the building, where they confronted those with whom Hector had earlier argued. Hector said, "[Y]ou wanted me to bring him so y'all can fight, so I brought him." After Herrera asked the victim if he was an informant, a melee broke out, with the victim and Hector fighting the others. The defendant did not participate in the fight, but watched from the back steps of the apartment building. The fight ended when someone said they would call the police.

As the brawlers disengaged, the victim smiled and laughed, and Hector and the defendant exchanged insults. The defendant brandished his firearm and pointed it at Hector and the victim, and Hector taunted the defendant to shoot him. The victim began backing away from the defendant, who went down the stairs and fired the gun in the direction of the victim and Hector. The victim and Hector turned and fled through the "cut," going in different directions. The defendant chased the victim. Multiple witnesses, including neighbors and participants in the fight, reported hearing three to five gunshots. One witness heard two shots in quick succession, then running feet, a third shot, and finally a scream, before seeing an individual who matched the defendant's physical description fire a final shot at the victim from a distance of between twelve to eighteen inches, causing the victim to fall to the ground on the sidewalk.

Immediately after the last shot was fired, Bosquet saw the defendant return to his truck parked in front of the apartment building and drive off, taking a left on Monument Street. Neighbors heard the sound of screeching tires and a vehicle speeding off, and observed a dark blue pickup truck "flying" out from Walford Way onto Monument Street.

The responding police officers found the victim lying on the sidewalk with a gunshot wound to the left side of his head, and no signs of life. The victim was pronounced dead at a hospital

later that night. The medical examiner concluded that the victim sustained three gunshot wounds — to the head, torso, and right arm — and that the cause of death was gunshot wounds to the head and torso.

*Discussion.* 1. *Sixth Amendment right to public trial.* On the first day of trial, the prosecutor moved that the judge institute a procedure whereby any member of the public who wished to attend the trial would first sign in and show a photographic identification card to the court officer posted outside the court room. The prosecutor argued that this procedure was justified by "intimations in this case about intimidation of witnesses," and told the judge that this procedure had been used in several cases where "there's any sort of gang affiliation involved." The defendant objected, claiming that the proposed procedure would violate his right to a public trial. The judge postponed ruling on the motion until the court began to hear evidence.

On the second day of trial, during the testimony of Bosquet, the witness asked the judge if he could ask him a question and the judge said, "No," and went to sidebar to confer with the attorneys. Bosquet then told the court reporter that the judge is "lucky we're not out on the streets." When the judge learned of this statement, he characterized it as "a major" and "direct threat to the Court."

On the third day of trial, the prosecutor renewed his request that all members of the public who enter the court room sign in and show identification.[4] The prosecutor spoke of the "gang overtones throughout this case" and the apparent threat made by Bosquet, and noted that, a few days earlier, a person with outstanding arrest warrants had "inquired of the mother and the sister" of a prosecution witness in the hallway of the court house. The prosecutor also argued that the identification procedure was justified to ensure compliance with witness sequestration, because there were persons on the witness list who did not know they were on the list, who had not been subpoenaed to testify, and whom the prosecutor did not know. The defendant again objected to the proposed measures and suggested, as alternatives, that the court officer post a witness list outside the

---

[4]The prosecutor this time did not specifically request photographic identification.

court room, or that the prosecutor contact each witness to inform them of his or her status as a prospective witness. After considering these arguments, and balancing the interests of safety and witness sequestration against the defendant's right to a public trial, the judge ordered that, before entering the court room, each spectator must sign in and "give a source of identification" to the court officer posted outside the court room.[5] The judge directed the court officers to bar from the court room all persons on the witness list, but stated, "If they are not on that list, by all means, they may come in here." The judge did not provide any guidance as to what the court officers should do if a spectator signed in but did not have a source of identification. But he made clear his intention, stating, "[I]n the system that I have set up here, . . . all the people who wish to attend this trial may attend this trial, except for the people who are listed as potential witnesses."

The defendant contends that the judge's order constituted a closure of the court room that violated his right to a public trial guaranteed by the Sixth Amendment.[6] See *Waller* v. *Georgia*, 467 U.S. 39, 46 (1984). We have recognized that "an open court room 'enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system,' " because "[t]he 'sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known' " (emphasis in original). *Commonwealth* v. *Cohen*, 456 Mass. 94, 107 (2010), quoting *Press-Enterprise Co.* v. *Superior Court*, 464 U.S. 501, 508 (1984).

A full closure of a court room in a criminal trial constitutes a violation of a defendant's Sixth Amendment right to a public trial unless the closure advances an "overriding interest" that otherwise is likely to be prejudiced and is "no broader than necessary to protect that interest." *Waller* v. *Georgia*, 467 U.S. at 48. This test is slightly modified for partial closures, where

---

[5]The judge did not specify that the identification be photographic. The record is silent as to whether the court officers permitted spectators to enter if their source of identification was not photographic.

[6]The Sixth Amendment to the United States Constitution states in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ."

"it is necessary to show a 'substantial reason' rather than an 'overriding interest' to justify the closing." *Commonwealth* v. *Cohen*, 456 Mass. at 111. Before ordering any closure of a court room, whether full or partial, a judge "must consider reasonable alternatives to closing the proceeding, and . . . must make findings adequate to support the closure." *Waller, supra.* Where a closure fails to satisfy these so-called *Waller* factors, the error is deemed "structural" in that prejudice is presumed and the defendant is entitled to a new trial. *Cohen, supra* at 118-119.

The judge in this case essentially made identification a condition of entry into the court room. The judge did not intend that this procedure bar anyone from the court room except those who were on the witness list, who were already barred from the court room by the sequestration order. We recognize that requiring spectators to sign in and provide some form of identification could potentially have resulted in some persons being unable to enter the court room because they did not have any identification on their person. We also recognize that others may have chosen not to enter the court room to avoid the need to identify themselves, perhaps because they feared that identifying themselves might bring them to the attention of the police or immigration authorities, or because they wished simply to preserve their anonymity. Any condition placed on entry into a court room, even these modest conditions of identification, that may prevent some members of the public from attending a trial and that may discourage others from attending implicates constitutional concerns about the right to a public trial, but that does not necessarily mean that every condition placed on entry constitutes a constitutional closure of a court room.

In all the cases where we have found a full or partial closure of the court room, spectators have been intentionally barred from the court room, either because the court officers put up a "[d]o not enter" sign on the door outside the court room, see, e.g., *Cohen*, 456 Mass. at 98-99, or because the judge ordered that the court room be closed to all or some members of the public. See, e.g., *Commonwealth* v. *Hardy*, 464 Mass. 660, 663, cert. denied, 133 S. Ct. 2356 (2013) (complete closure of court room during jury selection); *Commonwealth* v. *Caldwell*, 459

Mass. 271, 282 (2011) (one or two spectators removed from court room after alleged threat to court officers). See also *Commonwealth* v. *Lavoie,* 464 Mass. 83, 85, cert. denied, 133 S. Ct. 2356 (2013) (spectators excluded from court room during jury selection); *Commonwealth* v. *Dyer,* 460 Mass. 728, 734 (2011), cert. denied, 132 S. Ct. 2693 (2012) (individual voir dire conducted in judge's lobby). This is the first time we have confronted a defendant's argument that a constitutional closure of a court room occurred because a judge ordered spectators first to sign in and provide some form of identification before they were permitted to enter a court room. Therefore, we must first answer the threshold question of whether the identification requirement was a closure of the court room in the constitutional sense.

While this issue is new to us, it has been confronted by appellate courts in other jurisdictions, and they have resolved this question in essentially three different ways. In *Williams* v. *State,* 690 N.E.2d 162, 166 (Ind. 1997), the Indiana Supreme Court considered the same conditions on spectators imposed in this case: all spectators who were unknown to the court and wished to enter the court room were required to present identification to the court officer and sign in. The court concluded, "[T]his simply is not a case of partial or total closure of the proceedings to the public and so the constitutional right to a public trial is not implicated by the procedures as they were used in this case." *Id.* at 168-169. The court reasoned that "[b]oth a common sense reading of 'exclusion,' and, more importantly, the cases interpreting the public trial right, conceive of an exclusion as an affirmative act specifically barring some or all members of the public from attending a proceeding." *Id.* at 168. The court recognized that some persons may exclude themselves from the court room to avoid leaving their names at the door, but held that a defendant's right to a fair trial does not protect against what the defendant in that case characterized as "constructive exclusion." *Id.* Rather, the court held that a defendant's right to a public trial is put at risk where "the court, by order or otherwise, physically prevented the public from attending." *Id.*

Although the court concluded that these conditions on entry

did not rise to the level of a constitutional closure, it recognized that "[e]ven where the measure does not amount to a violation of the constitutional rights of the defendant, when access to public proceedings is impeded, even slightly, the right to be free to walk into court and assess our justice system in operation comes under threat." *Id.* at 169. The court therefore required under its supervisory powers "that the court make a finding that specifically supports any measures taken beyond what is customarily permitted that are likely to affect unfettered access by the press and public to the courtroom." *Id.* The court noted that "[t]he finding need not be extensive, but must provide the reasons for the action taken, and show that both the burdens and benefits of the action have been considered." *Id.*

In contrast, in *People* v. *Jones*, 96 N.Y.2d 213, 216, 219 (2001), the New York Court of Appeals held that a procedure whereby, during the testimony of an undercover police officer, a court officer was posted outside the court room who asked all spectators except attorneys and family members "their identity and their interest in coming to court" raised "the same secrecy and fairness concerns that a total closure does." The court, therefore, required (and found) justification under the *Waller* factors that apply to a total closure of the court room. *Id.* at 220.

In *United States* v. *DeLuca*, 137 F.3d 24, 32-35 (1st Cir.), cert. denied, 525 U.S. 874 (1998), the United States Court of Appeals for the First Circuit held that a screening and identification procedure constituted "at most" a partial closure of the court room where each spectator before entering the court room was required to present written identification to a deputy United States marshal, who recorded the spectator's name, address, and birth date, and used that information to determine whether the spectator had a criminal background or any connection with a defendant on trial. The court concluded that the screening procedures satisfied the *Waller* factors as applied to a partial closure where they "adequately addressed and significantly minimized the demonstrated potential for harassment and intimidation of jurors and witnesses by would-be trial spectators." *Id.* at 35. See *United States* v. *Smith*, 426 F.3d 567, 573-574 (2d Cir. 2005), cert. denied, 546 U.S. 1204 (2006) (requirement that

all who seek to enter court house provide photographic identification constituted partial closure but was justified by security concerns); *United States* v. *Brazel*, 102 F.3d 1120 (11th Cir.), cert. denied, 522 U.S. 822 (1997) (identification procedure that required all spectators to show identification and give name, address, and birth date before entering court room was partial closure "if the identification procedure [could] be said to have imposed a closure at all").

We conclude, as did the Indiana Supreme Court, that the conditions imposed on entry into the court room in this case did not rise to the level of a constitutional closure and, therefore, even if imposed in error, would not require reversal of the conviction for structural error. We note that the judge in this case required only identification as a condition of entry; he did not require that the court officer outside the court room door conduct any screening of spectators except to see if they were on the witness list. Contrast *People* v. *Jones*, 96 N.Y.2d at 216. Once spectators identified themselves, they were allowed into the court room unless they were on the witness list. Nor is there any suggestion that the court officers investigated the criminal history of spectators or provided their names to law enforcement for investigation. Contrast *United States* v. *DeLuca*, 137 F.3d at 32-35. The modest condition of entry in this case is qualitatively different from the type of closure that can only be justified under the standard set by the *Waller* factors and that, failing such justification, requires reversal of a conviction for structural error. To characterize so modest a condition as a closure would demean the significance of a closure in the context of a defendant's right to a public trial, and risk dilution of the standard justifying a closure.

Although we conclude that the conditions imposed by the judge of signing in and showing identification fell short of a constitutional closure, that does not mean that they may be imposed without justification or that they are exempt from judicial review. As did the Indiana Supreme Court, we exercise our supervisory power to preserve the presumption of openness of our court rooms even where the restriction on access falls short of a constitutional closure. As part of that presumption, a spectator should be free to enter a court room where a criminal

case against an adult is being adjudicated without first having to show identification or provide one's name. That presumption may be overcome and identification may be required of spectators only where a judge sets forth on the record the reasons that justify imposing this condition on entry based on the special circumstances of the case and only where the conditions are no broader than needed to accomplish their purpose. Any party may seek interlocutory review of such an order by a single justice, who will review it for abuse of discretion.

When spectators must first identify themselves before entering a court room, they lose their anonymity and therefore become more accountable for their conduct in the court room, because if they then attempt to intimidate a witness or disrupt the proceedings, the court officer will know who they are. This has the benefit both of discouraging those who had intended to engage in such behavior from attending the trial, and of diminishing the risk that those who do attend the trial will engage in intimidating or disruptive conduct. See *United States* v. *DeLuca*, 137 F.3d at 35 n.9. Because the conditions placed on entry into a court room may be no broader than needed to accomplish their purpose, and because the purpose of identifying court room spectators is to diminish the risk of witness intimidation and disruption of the court room, there must be an articulable risk of witness intimidation or court room disruption (or a comparable reason) that warrants the imposition of this condition on entry.

Not every criminal case justifies a finding of articulable risk, but we are satisfied that the special circumstances in this case more than warranted such a finding. The defendant in this case admitted he was a member of a youth gang, and he was accused of killing the victim because the victim was suspected of being an informant. A judge may recognize that, when a member of a gang is alleged to have committed a shooting, there is a risk that others associated with the gang may attempt to intimidate witnesses to cause them to exculpate, or at least avoid incriminating, the accused. There is also the risk that animosity that may exist between rival gangs, or between those associated with the accused and those associated with the victim, may spill over into the court room or the halls of the court house, and lead to

disruption of the court room. Gauging the tension in a court room is something that trial judges routinely do, even though an atmosphere of tension is difficult to describe, so we give deference to a trial judge's appraisal both of the air of tension and the dangers it posed. See *United States* v. *DeLuca*, 137 F.3d at 34. Cf. *Commonwealth* v. *Hardy*, 464 Mass. at 663-664 ("family and friends of the defendant and the victim divided into actively antagonistic factions" requiring court action to maintain control of court room). In this case, most of the witnesses who lived in or near the housing complex where the shooting occurred were reluctant to testify, some feigned memory loss, and others at trial recanted testimony they had provided to the grand jury. The prosecutor noted that a potentially ominous inquiry was made in the hallway before trial to the witness's mother and sister regarding a key prosecution witness. The judge himself was arguably threatened by the first witness in the case. A judge need not wait for a witness to be intimidated, the court room to be disrupted, or a specific threat before taking appropriate steps to address the risk of such misconduct.

While we conclude that special circumstances posing the dual risk of witness intimidation and court room disruption were present in this case, we differ with the judge to the extent that he relied on the need to ensure the sequestration of witnesses as a ground for requiring spectators to identify themselves before entering the court room. There is often a lengthy list of potential witnesses in a criminal case; if the enforcement of a sequestration order were sufficient alone to justify the identification of spectators, the exception of identification would devour the rule of openness. It is the responsibility of the attorneys in a criminal case to ensure compliance by their witnesses with the judge's order of witness sequestration; compliance with a sequestration order is not, by itself, a sufficient reason to justify an order requiring the identification of spectators.

We urge judges to provide more guidance in the future to court officers as to whether a photographic identification is required or simply preferred, and what should happen if a spectator did not bring the required identification. The judge made it clear that he did not intend his order to prevent any person who was not on the witness list from attending the trial, but he apparently did

not consider the possibility that his order could have barred persons from attending if they had no source of identification. Contrast *People* v. *Jones*, 96 N.Y.2d at 216 (judge offered, "if necessary, . . . [to] recess proceedings to determine whether an individual should be admitted").

2. *Admission of Bosquet's grand jury testimony.* Before the grand jury, Bosquet testified that he knew the defendant; that he saw the defendant's pickup truck parked in front of the apartment building on the afternoon of the shooting; that the defendant showed him that he was carrying a gun approximately five or ten minutes before Hector and the victim arrived at the apartment building; and that he saw the defendant follow the victim after the fight, then heard a gunshot, saw the defendant chase the victim, heard three more gunshots, and then saw the defendant return to his pickup truck and take a left turn onto Monument Street. At trial, however, Bosquet testified on direct examination that he did not know the defendant, that he did not recognize him in the court room, that he did not recall saying before the grand jury that he knew that the defendant was also known as "Braveheart," that he did not recall what vehicle the defendant drove on the day of the shooting, and that he did not recall seeing a gun that day or the defendant showing him a gun. Bosquet, who was fifteen years of age at the time of his grand jury testimony, testified at trial that he was "forced" to say what he had said to the grand jury and was "tricked" by the prosecutor and a police officer "into saying a lot of things . . . [he] wasn't going to say."

Based on Bosquet's testimony at trial during direct examination, where he disavowed or claimed lack of memory of his grand jury testimony, the judge found that Bosquet was feigning a loss of memory.[7] Just before the close of the prosecution's case, the judge allowed Bosquet's grand jury testimony to be read to the jury, and told the jury in his final instructions that they may consider "any prior inconsistent statement by a witness to a grand jury . . . as if the witness was testifying on the witness stand with no limitation on the use of the evidence."

In *Commonwealth* v. *Daye*, 393 Mass. at 75, we determined

---

[7]Defense counsel agreed that Bosquet "appear[ed] to be lying."

that prior inconsistent statements made under oath before a grand jury could be admitted substantively at trial, "provided the witness can be effectively cross-examined as to the accuracy of the statement, the statement was not coerced and was more than a mere confirmation or denial of an allegation by the interrogator, and other evidence tending to prove the issue is presented." In *Commonwealth* v. *Sineiro*, 432 Mass. 735, 745 & n.12 (2000), we extended this principle to encompass grand jury testimony of a witness who a judge determines is "falsifying a lack of memory."

The defendant claims that the judge erred for two reasons in admitting Bosquet's grand jury testimony without limitation. First, the defendant argues that, as a prerequisite to admitting grand jury testimony under *Daye*, the judge was required to conduct a voir dire with the witness. Second, the defendant claims that Bosquet's grand jury testimony should not have been admitted as substantive evidence because it was coerced. We are not persuaded.

In his first claim of error, the defendant relies on a footnote in *Daye*, 393 Mass. at 74 n.21, where we noted that, "[b]efore offering a prior inconsistent statement as probative evidence, counsel should ask for a voir dire, during which the witness should be reminded of the circumstances in which the statement was made and given the opportunity to explain the inconsistency." According to the defendant, a voir dire is a threshold requirement for the admissibility of inconsistent grand jury statements under *Daye*.

A voir dire often may be necessary to provide a judge with the information needed to make the preliminary evidentiary findings required under *Daye*. But we do not require a voir dire where the direct and cross-examination of the witness provide a sufficient basis for the trial judge's evidentiary determination. *Commonwealth* v. *Clements*, 436 Mass. 190, 192-94 (2002) (grand jury testimony ruled admissible after cross-examination). *Commonwealth* v. *Donnelly*, 33 Mass. App. Ct. 189, 198 (1992) ("Although . . . defense counsel did not seek a voir dire before attempting to use the prior inconsistent statements, the record before us establishes that the statements are inconsistent, that they are those of [the witness] and not the prosecutor, and that

they were voluntarily made"). Here, no voir dire was required because Bosquet's trial testimony provided the judge with more than enough information to make the required *Daye* findings and gave Bosquet abundant opportunity to explain his inconsistent statements and incredible lack of memory.

In his second claim of error, the defendant contends that the evidence did not support a finding that Bosquet's grand jury testimony was not coerced where he had testified that he was "forced" and "tricked" to make the statements at issue before the grand jury. The judge did not explicitly find that Bosquet's testimony before the grand jury was not coerced, but it is plain from the record that he was aware of the *Daye* requirements, so we reasonably may infer from his admission of Bosquet's grand jury testimony that he made such a finding. The judge's determination that the *Daye* requirements have been met "is conclusive as long as it is supported by the evidence." *Commonwealth* v. *Sineiro*, 432 Mass. at 742 n.6.

The evidence fully supports the finding that Bosquet's testimony was not coerced and "that the statement was that of the witness, rather than the interrogator." *Daye*, 393 Mass. at 74. Although Bosquet was the age of fifteen when he testified before the grand jury, his mother remained outside in the hallway, and he was informed that he could stop the questioning at any point to speak with her. Apart from vague assertions that the prosecutor had "forced" and "tricked" him, which the judge was not obliged to credit, the witness did not explain how the prosecutor had done so, despite extensive questioning regarding his inconsistent statements and claimed memory loss. Sergeant Detective William Duggan of the Boston police department, who served Bosquet's mother with the subpoena and who was present at the grand jury, testified that he did not threaten the witness or tell him what to say, and was not aware of any threats or pressure from the police or prosecutor. Moreover, our review of the prosecutor's grand jury questions reveals that they were not leading, but allowed the witness to recount his version of the events in his own words. We conclude that the judge was not clearly erroneous in finding that Bosquet's grand jury testimony met each of the *Daye* prerequisites and was properly admitted as substantive evidence.

3. *Admission of Rivera's hearsay statement.* On the sixth day of trial, Rivera initially testified that he did not see the defendant with a weapon in his hand on the day of the killing. However, he later testified that the fight in the "cut" stopped when the defendant pulled out a gun, that the defendant then fired the gun and the victim raced out of the "cut," and that he then heard two more gunshots. The jury also learned during his testimony that he had told the grand jury that he saw the defendant fire three shots with the gun.

On the ninth day of trial, the prosecutor called Alessa Castellon to the stand, who testified that Rivera was her best friend and that she considered him to be like a brother. The prosecutor elicited from Castellon an admission that she had committed perjury before the grand jury by falsely testifying that she had seen the shooting, when she had not. When the prosecutor asked what made her go before the grand jury under oath and say that she had seen the shooting, defense counsel initially objected, but then withdrew the objection. Castellon answered that it hurt her to see Rivera so scared. Later, the prosecutor asked her why she falsely told the grand jury that she had seen the defendant shoot the victim, and defense counsel objected, noting at sidebar that the prosecutor hoped to elicit with this question that Rivera had told her that he had seen the shooting. Defense counsel offered to withdraw his objection if the judge agreed to give a limiting instruction, and the judge agreed to do so. Although the transcript does not reflect the entirety of her answer, it appears that Castellon testified that Rivera had told her that he saw the defendant shoot the victim, and that she wanted to protect him so that he would not have to testify. The judge then explained to the jury that what Rivera told Castellon was not admitted for its truth but only for "the fact that it was said." The prosecutor later asked *when* Rivera had told her that the defendant shot the victim. The defendant objected, and the objection was overruled, with the judge reiterating that the answer was not admissible for its truth. Castellon then said that Rivera had told her this "on the [I]nternet."[8] The defendant contends that "the prosecutor called Castellon for the sole

---

[8]Although defense counsel objected to this question, he appeared to be asking for nothing more than the same limiting instruction the judge had earlier

purpose of introducing Rivera's prejudicial and inadmissible hearsay statements to her" that he saw the defendant shoot the victim, and that the admission of this hearsay created a substantial likelihood of a miscarriage of justice.

Although G. L. c. 233, § 23, permits a party to impeach its own witness with prior inconsistent statements, "a party cannot rely on this statutory right to call a witness whom he knows beforehand will offer no testimony relevant to an issue at trial solely for the purpose of impeaching that witness." *Commonwealth* v. *McAfee*, 430 Mass. 483, 489-490 (1999), citing *Commonwealth* v. *Benoit*, 32 Mass. App. Ct. 111, 114-115 (1992).[9] Our holding in *McAfee*, *supra* at 490, furthers "the sound policy of not permitting a litigant to evade the principle of hearsay exclusion and to introduce evidence which would be improper for the jury to consider for its substantive value."

Here, we have grave doubts as to the propriety of the prosecutor's questions intended to elicit from Castellon the hearsay statement that Rivera told her that he had seen the defendant shoot the victim. The prosecutor recognized that this statement would be inadmissible hearsay if it were not offered to explain why Castellon falsely testified that she had seen the defendant shoot the victim and, even if admitted, could not be considered by the jury for the truth of the matter asserted.[10] But the only reason why an explanation was needed for her false testimony was that the prosecutor elicited her false testimony, and her perjury was relevant only to impeach the credibility of her other

---

provided, which he received. There is nothing in the record to suggest that the defendant had changed his position that this testimony was admissible with that limiting instruction. In fact, when defense counsel commenced his cross-examination of Alessa Castellon, he asked if Rivera had told her that Rivera had seen the defendant shoot the victim, which suggests that he did not intend to bar this testimony.

[9]General Laws c. 233, § 23, states: "The party who produces a witness shall not impeach his credit by evidence of bad character, but may contradict him by other evidence, and may also prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them."

[10]The prosecutor did not contend that Rivera's statement was admissible as a prior consistent statement.

testimony, which was of little consequence to the prosecution's case. It is not clear whether the prosecutor's sole reason to call Castellon to testify was to elicit Rivera's hearsay statement, but it is likely that what the jury primarily took from her testimony was that Rivera had told her that he saw the defendant shoot the victim. "[I]t would be an abuse of the rule, in a criminal case, for the prosecution to call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence — or, if it didn't miss it, would ignore it." *United States* v. *Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984).

The defendant, however, did not object to the admission of this testimony provided a limiting instruction was given, which it was, so we consider only whether the admission of this hearsay with the limiting instruction created a substantial likelihood of a miscarriage of justice. We conclude that it did not. The theory of the defense in this case, as reflected in the defendant's closing argument, was that the defendant and the victim were both outsiders, while the prosecutor's gang-member witnesses were insiders who were committed to each other rather than the truth, and "in one fell swoop they got rid of both outsiders." Where the theory of the defense was that gang members and their friends colluded falsely to accuse the defendant of the killing, the admission of Castellon's testimony that she falsely claimed before the grand jury to have seen the defendant shoot the victim and her testimony that Rivera told her "on the [I]nternet" that he had seen the defendant shoot the victim was consistent with that defense, which might be why the defendant's able and experienced trial counsel did not object to the admission of this evidence with a limiting instruction. In any event, even if the jury ignored the judge's limiting instruction and considered Rivera's hearsay statement for the truth of the matter asserted, the prosecution did not rest heavily on Rivera's credibility in presenting its case, and there was so much other compelling evidence that the defendant was the lone shooter in this case that "we are substantially confident that, if the error had not been made, the jury verdict would have been the same." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).

4. *Failure to question other jurors.* At the end of the second day of trial, the judge received a note from juror number eight that read: "I have a concern concerning our safety considering this is a gang related event. I notice that the defendant has access to our juror information, such as name, where we live, where we work, etc. Isn't this a breach of our juror confidentiality or isn't there any confidentiality for the juror? I just want to make sure that our safety is secure[d] by the court to avoid any jury tampering due to the fact that this trial is gang related. These are my concerns." The following day, the judge conducted an individual voir dire with juror number eight, in which he explained that neither counsel nor the defendant had access to the portion of the juror questionnaire that contained juror addresses, and that the questionnaires are shredded after jury selection. The juror responded that she understood, and did not express any other concerns. In response to the judge's question, the juror indicated that she could remain fair and impartial.

At the suggestion of defense counsel, the judge inquired whether the juror "had an opportunity to discuss [with the] other jurors the subject matter of [her] question." The juror responded that she had posed the question whether anybody else was concerned that "that they have our information" from the juror questionnaires, and "no one really expressed concern," so she "dropped it" and instead decided to bring the matter to the attention of the judge. Defense counsel expressed satisfaction with the juror's response, and did not ask that the other jurors be questioned about this matter.

After the defendant was convicted, he filed a motion for a new trial alleging that the judge's failure to conduct a voir dire with the other jurors after they were exposed to "extraneous" prejudicial information violated his right to an impartial jury under the Sixth Amendment and art. 12 of the Massachusetts Declaration of Rights. The trial judge, citing *Commonwealth* v. *Kendrick*, 404 Mass. 298, 303 (1989), and *Commonwealth* v. *Federici*, 427 Mass. 740, 746-747 (1988), denied the defendant's motion, noting that the juror's inquiry about the juror questionnaire did not suggest that the jury possessed any extraneous information and that, unless there is a substantial risk of extraneous influence, a judge has broad discretion to decide

whether individual questioning is required to explore the possibility of juror prejudice. We conclude that there was no error in the judge's denial of the defendant's motion for a new trial, and no substantial likelihood of a miscarriage of justice arising from the other jurors not being questioned about the matter.

"When a judge determines that the jury may have been exposed during the course of trial to material that 'goes beyond the record and raises a serious question of possible prejudice,' he should conduct a voir dire of jurors to ascertain the extent of their exposure to the extraneous material and to assess its prejudicial effect." *Commonwealth* v. *Francis*, 432 Mass. 353, 369-370 (2000), quoting *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). But a juror's mistaken belief that counsel and the defendant have learned her address from her juror questionnaire is not extraneous information and therefore does not pose a substantial risk of prejudice arising from an extraneous influence on the jury. See *Francis*, *supra* at 370 (dismissed juror's brief and unspecified expression of fear to other jurors was not "extraneous influence on remaining jurors" and did not raise "a serious question of possible prejudice"). See also *Commonwealth* v. *Fidler*, 377 Mass. 192, 200 (1979) (extraneous information described as "specific facts not mentioned at trial concerning one of the parties or the matter in litigation").

Rather, at most, the juror's inquiry raised a concern that she might not be impartial if she feared for her safety. See *Francis*, 432 Mass. at 367-369 (in trial of "chief enforcer" of gang accused of murdering supposed member of rival gang, good cause for juror's removal where she questioned her impartiality because she was "afraid" and "nervous" that there were gang members in her neighborhood). But the juror's concern for her own safety was alleviated when she learned that her address was not made available to counsel or the defendant, and the judge was satisfied that she remained fair and impartial. Where she had discussed her concern about the dissemination of her address with other jurors, and none shared her concern, the judge acted well within his discretion in not ordering that all the jurors be questioned on this matter, especially where a capable and experienced defense counsel did not so request. *Commonwealth* v. *Tanner*, 417 Mass. 1, 5 (1994) (failure to ask for voir dire "gives us some evidence

of [defendant's] perception of the seriousness of the incident"). Each juror had individually been made aware during jury selection that there may be evidence of "gang involvement," and each had satisfied the judge that this would not affect his or her ability to be fair and impartial. Exploring this matter with each of the other jurors might have triggered concern among the jurors for their safety where they previously had expressed none, and potentially have suggested that their safety may have been at risk if the defendant had learned of their addresses.

5. *Review under G. L. c. 278, § 33E.* Although the defendant does not advance an argument pursuant to G. L. c. 278, § 33E, we have examined the record and discern no basis to exercise our authority to set aside or reduce the verdict of murder in the first degree.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*