## Commonwealth vs. Charon Ray.

Suffolk. October 11, 2013. - February 12, 2014.

Present: Ireland, C.J., Cordy, Gants, Duffly, & Lenk, JJ.

*Homicide. Practice, Criminal,* Public trial, Waiver, Assistance of counsel,
Continuance, Motion to suppress, Voluntariness of statement, Hearsay,
Conduct of juror, Sentence. *Constitutional Law,* Public trial, Waiver of
constitutional rights, Assistance of counsel, Voluntariness of statement,
Sentence, Cruel and unusual punishment, Parole, Capital case. *Due Process
of Law,* Assistance of counsel, Sentence, Parole. *Waiver. Intimidation of
Witness. Evidence,* Voluntariness of statement, Hearsay, Impeachment of
credibility. *Witness,* Intimidation, Impeachment. *Jury and Jurors.*

A criminal defendant could not argue that the exclusion of the public from a
two-day jury empanelment violated his constitutional right to a public trial,
where defense counsel affirmatively acquiesced to the judge's proposal to
close the court room for the jury selection process. [121-122]

At a criminal trial, the procedure implemented by the judge, in which individu-
als were required to present identification and sign in with a court officer
before entering the court room, did not violate the defendant's right to a
public trial under the Sixth Amendment to the United States Constitution,
where the conditions on court room entry were appropriate under the
circumstances, given concerns about witness intimidation and safety; and
where the conditions imposed were no broader than necessary to achieve
their purpose. [122-126]

A Superior Court judge, in determining that the assistance that a criminal
defendant received from trial counsel was not ineffective, did not err in
concluding that counsel's frequency of contact with the defendant was
neither unusual nor indicative of incompetence, or in concluding that
counsel was adequately prepared for trial; further, the defendant failed to
carry his burden of establishing that counsel's failure to pursue testimony
from a potential eyewitness likely deprived him of an otherwise available,
substantial ground of defense. [126-128]

A Superior Court judge did not abuse her discretion in denying a criminal
defendant's motion for a continuance, given the timing and lack of specificity
of defense counsel's request and the fact that the denial resulted in no
measurable detriment to the presentation of a defense. [128-130]

A Superior Court judge did not err in denying a criminal defendant's pretrial
motion to suppress statements that he made during a police interview, where
the Commonwealth met its burden of proving both that the defendant, who
was nearly seventeen years old at the time and had prior experience with the
court system, but was not afforded a genuine opportunity to consult with an
interested adult, nevertheless had knowingly and voluntarily waived his
Miranda rights, and that his statements were voluntary. [130-134]

There was no merit to a criminal defendant's argument that the judge at his trial impermissibly limited his cross-examination of a Commonwealth witness. [134-138]

There was no error or abuse of discretion in a Superior Court judge's decision to permit a juror who had appeared to be asleep at numerous times during trial to participate in deliberations, where the judge conducted a voir dire of the juror and satisfied herself that he could fairly participate; further, defense counsel was not ineffective in his approach to this issue. [138-139]

This court remanded for resentencing, in light of its decision in *Diatchenko* v. *District Attorney for the Suffolk Dist.*, 466 Mass. 655 (2013), a case in which the criminal defendant, who was under the age of eighteen at the time of the crime, was sentenced to life in prison without the possibility of parole. [139-140]

INDICTMENTS found and returned in the Superior Court Department on September 29, 2005.

A pretrial motion to suppress evidence was heard by *Patrick J. Riley*, J.; the cases were tried before *Janet L. Sanders*, J., and a motion for a new trial, filed on July 26, 2010, was heard by her.

*Robert F. Shaw, Jr.*, for the defendant.

*Helle Sachse*, Assistant District Attorney, for the Commonwealth.

CORDY, J. On the evening of June 10, 2004, two teenage boys were shot from behind on Hazelwood Street in the Roxbury section of Boston following ongoing animosity between two groups of local teenagers. One was injured, and the other, Dakeem Galloway (Dakeem), fourteen years of age, died from a gunshot wound to the head. The defendant, Charon Ray, who was sixteen years of age at the time of the shooting, was subsequently indicted for the murder. In June, 2007, after a jury trial, he was found guilty of deliberately premeditated murder in the first degree.[1] He appealed from the convictions, as well as from the denial of his third motion for a new trial, which asserted that his right to a public trial was violated by a full closure of the court room during jury selection and a partial closure during trial, and that he was denied effective assistance of counsel due to trial counsel's inadequate preparation and

---

[1]The defendant was also indicted and found guilty of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A; and unlawful possession of a firearm, G. L. c. 269, § 10 (*a*).

failure to investigate and procure the testimony of a potential eyewitness. On appeal, the defendant also asserts that the judge erred in denying his request for a continuance and his motion to suppress statements he made to the police, impermissibly limited his cross-examination of a Commonwealth witness, and wrongly permitted a sleeping juror to participate in deliberations in violation of his right to a fair and impartial jury. Finally, he asserts that, in light of the decision of the United States Supreme Court in *Miller* v. *Alabama*, 132 S. Ct. 2455 (2012), his sentence to life imprisonment without the possibility of parole violates the Eighth Amendment to the United States Constitution. Because we find no reversible error and discern no basis to exercise our authority under G. L. c. 278, § 33E, we affirm the defendant's convictions. However, in light of our decision in *Diatchenko* v. *District Attorney for the Suffolk Dist.*, 466 Mass. 655 (2013), interpreting *Miller*, we vacate the sentence and remand the case to the Superior Court for re-sentencing.

*Background.* We summarize the evidence presented by the Commonwealth at trial, reserving certain details for our discussion of the issues raised.

For several years prior to the shooting, there had been tension and conflict between two groups of friends based around neighboring housing complexes located in Roxbury, known as Charlame I and Charlame II. In June, 2004, the defendant; brothers Rasheed Moore, Marcel Campbell, and Anthony Yancy; and brothers Julian, Jonathan, and Ronald Rogers were considered part of the Charlame I group. Dakeem (the victim), Jarrod Baskin, Thomas Burns, Javone Cole, Vincent Lockett, Jumani Mobley, and La-Lance Smith were considered part of the Charlame II group.

On June 10, 2004, there was a series of altercations between these groups. After school that day, Dakeem and his Charlame II friends, Baskin, Burns, Cole, Lockett, and Smith, apparently played basketball, as was their usual routine. At approximately 3 P.M., the boys walked to a store nearby to buy sodas and encountered the defendant. They exchanged words. On their return to Charlame II, the boys took a different route. At approximately 4 P.M., Dakeem indicated that he needed to return to the store for his mother. Smith accompanied him, and on the

way they were approached by the defendant, accompanied by Moore and a third boy from Charlame I. They again exchanged words, and this time engaged in a physical fight. Dakeem and Smith then returned to Charlame II between 4 and 5 P.M.

Also that day, Campbell (of Charlame I) and Mobley (of Charlame II) had a fight outside the Lewis basketball court. The dispute arose from the taking by the Charlame I boys of a hat belonging to Dakeem. Dakeem and Smith had earlier tried to retrieve the hat with the help of Dakeem's stepfather but were unsuccessful. During the fight, Campbell attempted to pull out a knife, but a man identified as Kyrice Grady took it from him. When the boys dispersed, Mobley and his friends returned to Charlame II.[2]

At approximately 8:30 P.M., Smith, who lived a bus ride away from Charlame II, decided he wanted to go home. Dakeem, Baskin, Burns, Cole, and Lockett accompanied Smith to the bus stop because of the earlier conflict between Mobley and Campbell. Although Smith normally would walk along Martin Luther King Jr. Boulevard or Catawba Street to reach the bus stop on Warren Street, the boys took the longer route along Humboldt Court and Hazelwood Street, because they wanted to avoid further problems with the Charlame I group. From their route, they could see numerous people gathered at Charlame I. At trial, Baskin testified that in the group he saw the defendant, wearing a white T-shirt and jeans, and Moore, wearing a sports jersey. He said that Moore was giving the defendant a black Champion-brand sweatshirt with a hood that was pointed at the top. As the Charlame II boys continued to walk down Hazelwood Street, a shooter located behind them fired six to seven gunshots. The boys ran down Hazelwood Street toward Warren Street. Burns was grazed by a bullet, and Dakeem was fatally injured by a gunshot wound to the head.

---

[2]Two witnesses described additional or alternative altercations between the two groups that day. Tatiana Magazine, who was Mobley's foster sister, testified that she witnessed the defendant, accompanied by Moore and other Charlame I boys, threatening Baskin around 5:00 P.M. The defendant said that he was "going to shut things down," gestured in a fighting way, and lifted his shirt to show a gun in his waistband. At the time, the defendant and Moore both wore black hooded sweatshirts but had them tied differently. Additionally, Baskin described an incident in which the defendant pulled out a knife during an altercation between the defendant and Smith, Burns, and Dakeem.

At approximately 9 P.M., officers and paramedics responded
to a 911 telephone call from the scene. During a search of the
area, the detectives found five spent casings fired by an unre-
covered .25 caliber pistol, and a bag approximately the size of a
golf ball, likely containing marijuana, near a large blood stain.
No identifiable fingerprints were found on the casings or bag.
The police also recovered a Razor-brand scooter from the scene.

1. *Identification witnesses.* None of the witnesses brought to
the police station on the night of the shooting and interviewed
by the detectives identified the shooter. Smith and Baskin, who
both had accompanied Dakeem that night, denied recognizing
the shooter in the police interviews. At a subsequent grand jury
proceeding, however, Baskin testified that the defendant was the
shooter, and at trial he testified that when he looked back as
they were running, he saw "the same hoodie and a white [T]-shirt
. . . that [the defendant] had on" and could tell that it was the
defendant by his outfit. He also testified that he saw the shooter
run through an alley toward Humboldt Court. Smith continued
to deny that he saw anyone when he testified at the grand jury
proceeding. At trial, however, he testified that he looked back at
the shooter and saw "a Champ hoodie" tied a specific way and
light eyes that resembled those of the defendant or Moore. Tati-
ana Magazine, Mobley's foster sister and the defendant's
schoolmate, also testified at trial that at school the next day, she
accused the defendant of being the shooter, and he did not deny
it. One witness testified that she saw a young man, in a dark
hooded sweatshirt with the hood up, run toward the group of
boys just before the shooting and extend his arm out toward the
group. Another witness testified that the shooter had on a fitted
baseball cap, and that she saw him run up the stairs at the alley
near Humboldt Court, trip, and fall.

2. *Kyrice Grady's testimony.* At trial, and contradictory to the
testimony he gave before the grand jury, Kyrice Grady denied
knowing the defendant and being present on the night of the
shooting. Consequently, the testimony that Grady gave before
the grand jury regarding what he observed on the evening of the
shooting was read into evidence.[3]

According to Grady's grand jury testimony, near the time of

[3]The *Daye* requirements for admission of grand jury testimony were suf-

the shooting, Grady and Stephen Galloway were hanging out at Charlame II. When Dakeem said he wanted to go to the store, Grady warned him that there were many Charlame I people out there. Grady saw Dakeem, Baskin, Smith, and a few others walk up Humboldt Avenue and turn into Humboldt Court, which connects to Hazelwood Street. Grady knew the defendant well, and had "watched him grow up." From his viewpoint at Charlame II, Grady could see that a blue van had pulled up at Charlame I, and someone had brought the defendant "the [black] Champ," which the defendant put on over his white T-shirt and baseball hat. The defendant then ran to Charlame First Court, which leads to Martin Luther King Jr. Boulevard, crossed the boulevard, and ran up the stairs leading to Humboldt Court and Hazelwood Court. Grady, concerned about what might happen to his Charlame I friends, followed the defendant on a Razor-brand scooter. He then heard six or seven gunshots but did not know who the shooter was at that moment. Immediately thereafter, the defendant literally ran into Grady in the alley near Humboldt Court and Hazelwood Court, close to where the shots had come from. Grady testified that the defendant lifted his hand up and had a silver semiautomatic gun. The defendant looked at Grady and then turned and ran up the stairs, falling on his way. Grady briefly chased the defendant and encountered him again, at which time the defendant had taken off the black Champ and was once again wearing a white T-shirt and a baseball hat. Grady then returned to the scene of the shooting, where he left the scooter and observed a bag of marijuana on the ground. In Grady's account, Stephen Galloway accompanied him for most of this pursuit. At the grand jury proceeding, Grady also identified the defendant as the shooter from a photographic array.

3. *Stephen Galloway's testimony.* Galloway was Dakeem's cousin and shared an apartment with Grady. At trial, Galloway corroborated much of Grady's grand jury testimony. He testified that he and Grady were at Charlame II the night of the shooting. A group of boys, including the defendant and Moore, were hanging out at Charlame I. Galloway saw an automobile

ficiently met. See *Commonwealth* v. *Daye*, 393 Mass. 55, 66 (1984), overruled on other grounds by *Commonwealth* v. *Le*, 444 Mass. 431 (2005).

pull up near them, and several individuals exited and tossed around a black hooded sweatshirt. He then saw Dakeem and his friends walking on Humboldt Avenue. He observed two boys wearing black clothing run from Charlame I toward Martin Luther King Jr. Boulevard. Galloway then started running in that direction to intercept the boys; he was accompanied by Grady on a scooter. Grady got ahead of him, and when Galloway got to the alley near Humboldt Court and Hazelwood Court, where Grady was, he saw Grady face-to-face with someone who was pointing a gun at him. The gunman was wearing a hooded sweatshirt, and Galloway could not see his face. The shooter then ran up the stairs and tripped while doing so.

*Discussion.* We first address the court closure issues raised in the defendant's third new trial motion and then turn to his additional claims.

1. *Closed court room during jury selection.* The defendant's primary argument in his motion for a new trial was that the exclusion of the public from the two-day jury empanelment violated his right to a public trial pursuant to the Sixth Amendment to the United States Constitution. See *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 106 (2010), citing *Presley* v. *Georgia*, 558 U.S. 209, 213 (2010). Consistent with our recent decisions in *Commonwealth* v. *Morganti, ante* 96, 102-103 (2014); *Commonwealth* v. *Hardy*, 464 Mass. 660, 663, cert. denied, 134 S. Ct. 248 (2013); and *Commonwealth* v. *Lavoie*, 464 Mass. 83, 84, cert. denied, 133 S. Ct. 2356 (2013), we reject the defendant's argument.

It is undisputed that the court room was closed during the jury selection process after the trial judge suggested clearing the court room for individual juror questioning. Counsel for the Commonwealth and the defendant affirmatively agreed to the procedure. During the two-day jury empanelment, the only people in the court room were trial counsel, the defendant, the judge, the court reporter, and the individual juror being questioned. After the trial, several of the defendant's friends and family members reported that they had not been permitted to enter the court room during the jury selection process.

The right to a public trial may be waived. *Cohen (No. 1)*, 456 Mass. at 105-106, quoting *Commonwealth* v. *Edward*, 75 Mass.

App. Ct. 162, 173 (2009). As in *Morganti, supra* at 101, the issue here is "whether the defendant, through the acquiescence of counsel, waived his right to an open court room during the empanelment." Trial counsel here not only did not object, but affirmatively acquiesced to the judge's proposal to close the court room for the jury selection process. Accordingly, the defendant's right to a public trial was waived during that portion of the proceedings.[4]

2. *Sign-in procedure during trial.* We turn next to the sign-in procedure implemented by the judge during trial, which the defendant contends was an unconstitutional partial closure.

By way of context, the case was permeated with concerns regarding witness intimidation from the outset. Early on, in connection with its production of discovery material, the Commonwealth filed a motion for a protective order, in which it described a specific incident where the defendant allegedly had brandished a gun at a witness, and further indicated that several

---

[4]The defendant does not raise an ineffective assistance of counsel claim on this issue, but if he had, we would not consider trial counsel's failure to object to the closure to have constituted ineffective assistance giving rise to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). See also *Commonwealth* v. *Morganti*, *ante* 96, 104-105 (2014); *Commonwealth* v. *Hardy*, 464 Mass. 660, 665, cert. denied, 134 S. Ct. 248 (2013). "Counsel is ineffective where his conduct falls 'below that which might be expected from an ordinary fallible lawyer' and prejudices the defendant by depriving him 'of an otherwise available, substantial ground of defence.' " *Commonwealth* v. *Lavoie*, 464 Mass. 83, 89, cert. denied, 133 S. Ct. 2356 (2013), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). We employ an objective assessment of reasonable professional conduct at the time of trial. See *Strickland* v. *Washington*, 466 U.S. 668, 687-688 (1984); *Hardy, supra* at 665.

We cannot say that trial counsel's conduct here was "manifestly unreasonable" and fell below the professional standards at the time. See *Commonwealth* v. *Butler*, 464 Mass. 706, 709 (2013), quoting *Commonwealth* v. *Rodriques*, 462 Mass. 415, 425-426 (2012). See also *Saferian*, 366 Mass. at 96. Cf. *Morganti, supra* at 103-105 (reaching same conclusion). Because we employ an objective standard, we do not find persuasive the defendant's argument that trial counsel subjectively was unaware that the right to a public trial applied to jury empanelment. Rather, trial counsel asserted his preference for what he termed an "executive session," suggesting that he was actively seeking to further his client's interests through a nonpublic jury empanelment process. Cf. *Hardy*, 464 Mass. at 665-666 (counsel refraining from objecting to closure was not objectively unreasonable even though she was unaware of right to public trial because she sought to protect client's interest).

witnesses had expressed concerns for their safety. As a consequence, the parties agreed that trial counsel would not provide the defendant with any discovery until there was a ruling on the Commonwealth's motion. On December 2, 2005 (approximately eighteen months prior to trial), the motion judge issued a protective order limiting the discovery materials that trial counsel could share with the defendant, essentially prohibiting counsel from sharing unredacted written discovery materials that would reveal the identity of witnesses.[5] We declined to set aside this protective order when the defendant sought interlocutory review. See *Ray* v. *Commonwealth*, 447 Mass. 1008, 1008-1009 (2006).

In October, 2006, and again in March, 2007, the protective order was modified but continued in effect. Finally, at the beginning of trial, and in spite of the Commonwealth's continued concerns about the potential distribution of the grand jury minutes, the trial judge lifted the order and granted the defendant full access to discovery materials during trial.

In light of its concerns, the Commonwealth requested that the judge require individuals to present identification and sign in with a court officer before entering the court room. Emphasizing the "gang mentality" underlying the case, the Commonwealth underscored the concerns that had led to the protective order and noted that the victim's mother previously had had problems with two observers present in the court room. Trial counsel opposed the request, arguing that the case did not rise to the level of a gang-driven dispute and stating that there was no evidence of a potential disruption.[6] He argued further that building security

---

[5]Specifically, the protective order prohibited trial counsel from providing the defendant with copies of the grand jury minutes, revealing the identity of any witness in connection with any statement, providing the defendant with the address of any witness or with the names of any witnesses in writing, and sharing any other discovery materials with anyone other than the defendant. The motion judge was persuaded that limiting the disclosure of the grand jury minutes specifically was important to protect the safety of the witnesses.

[6]The parties dispute whether trial counsel sufficiently objected to the implementation of the sign-in procedure and therefore preserved the issue for review. The trial transcript reflects that when the parties initially discussed the Commonwealth's request, counsel stated that the request would violate the defendant's right to a public trial. Although counsel did not reiterate his concerns when the sign-in procedure was implemented, we nonetheless consider the issue preserved for purposes of review.

procedures would be sufficient to ensure the physical safety of those in attendance at trial.

The judge carefully considered the arguments of both parties regarding the need for and the burden of such a procedure. Although the judge expressed concern about discouraging attendance, she recognized that the requested procedure would be a minimal intrusion and she did not want to "wait until it's too late." She concluded that such a measure would help protect those in attendance in light of the rivalry between the groups at issue in the case and noted that similar safety concerns were present in other trials in the court house.

Accordingly, simultaneous with the lifting of the protective order, the judge stated that she would implement the requested sign-in procedure. In so doing, she required all attendees to step outside the court room and provide identification, "preferably" photographic, and sign in with the court officers before reentering the court room.

The defendant asserts that this sign-in procedure, which was in place throughout trial, was a partial closure in violation of his right to a public trial. We recently addressed this claim in *Commonwealth* v. *Maldonado*, 466 Mass. 742, 746, 751 (2013), where we held that a sign-in procedure that was not intended to bar individuals from the court room did not rise to the level of a constitutional closure. We similarly conclude here that there was no partial closure during the trial, and further determine that the condition on court room entry was appropriate under the circumstances.

In *Maldonado*, 466 Mass. at 751, we set forth a framework for evaluating a condition on court room access "to preserve the presumption of openness" even where there is no constitutional closure. To impose a condition on entry, "there must be an articulable risk of witness intimidation or court room disruption (or a comparable reason)" specific to the case, the judge must "set[ ] forth on the record the reasons that justify imposing th[e] condition," and the condition must be "no broader than needed to accomplish [its] purpose." *Id.* at 752.

The sign-in requirement we assessed in *Maldonado*, 466 Mass. at 752-753, met these criteria. In that case, the trial judge had justifiable concerns that the defendant's youth gang affilia-

tion and the interpersonal animosities would disrupt the court room. See *id.* at 752. "[M]ost of the witnesses who lived in or near the housing complex where the shooting occurred were reluctant to testify, some feigned memory loss, and others at trial recanted testimony they had provided to the grand jury." *Id.* at 753. These circumstances were sufficient to provide a justification for imposing a condition, see *id.*, and the judge ordered that all observers sign in and show identification to the court officer prior to entering the court room. *Id.* at 747. This requirement, which did not specify that the identification must include a photograph, *id.* at 747 & n.5, was no broader than necessary to achieve the intended goals of "diminish[ing] the risk of witness intimidation and disruption of the court room." *Id.* at 752.

Here, similar tensions pervaded the case and introduced safety concerns. The protective order, which restricted the defendant's access to discovery until trial, reflected serious concerns about witness intimidation by the defendant and his associates and about the safety of witnesses who remained in the community. These concerns had been recognized by two prior motion judges in granting and upholding the protective order, and were only magnified by similar issues arising in gang-related cases being tried in the Suffolk County Superior Court during the same time period. Although the judge did not formally state her findings supporting the condition on court room entry, the judge's thoughtful discussion with counsel and her explanation for implementing the requirement were sufficient to demonstrate an articulable risk and the reasons for imposing the condition.

We turn next to whether the sign-in and identification requirements were "no broader than needed to accomplish their purpose . . . [of] diminish[ing] the risk of witness intimidation and disruption of the court room." See *Maldonado,* 466 Mass. at 752. In *Maldonado,* there was no stated requirement that the identification required for admission to the court room needed to be photographic. *Id.* at 747 & n.5. Here, the judge stated, "Anyone attending this trial . . . is going to be required to sign in and provide some kind of identification. It doesn't have to be a driver's license, but something so that the court officer is convinced that you are who you say you are." She later indicated

that all attendees would need to "provide . . . photo ID preferably, or some ID and a name." This direction is not significantly different than that in *Maldonado* and suggests that many forms of identification, not only photographic ones, would be sufficient. See *id.* at 747 (attendees must "give a source of identification" and sign in). We therefore conclude that the sign-in requirement was no broader than necessary to achieve its purpose.[7] See *id.* at 752.

3. *Ineffective assistance of counsel.* As his final claim in his third new trial motion, the defendant contends that trial counsel was ineffective in two respects. First, the defendant asserts that he was not consulted or informed sufficiently about his defense, as evidenced by counsel's infrequent jail visits, and that his counsel was not adequately prepared for trial. He claims that trial counsel misunderstood the protective order and continued to limit the scope of his conversations with the defendant even after the order was modified.

Second, the defendant avers that his counsel was ineffective in failing to investigate a potential eyewitness, Karl Chester, who was mentioned in a police report. He argues that interviewing this individual would have provided helpful third-party culprit evidence to the defense, and that trial counsel's failure to do so fell below the accepted standard of conduct.

The motion judge, who was also the trial judge, concluded that trial counsel was not ineffective, using the two-prong standard from *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). "Counsel is ineffective where his conduct [1] falls

---

[7]The fact that some individuals may have been excluded from the court room does not in and of itself suggest that the condition was overly broad. Affidavits submitted by the defendant in support of his motion for a new trial indicate that three young men were denied entry due to lack of identification and that others may not have been permitted to return to the court room once the judge issued the requirement. As the judge acknowledged in her denial of the new trial motion, one of the young men denied entry was on the witness list and therefore was otherwise ineligible to observe the trial, and the others did not attempt to attend after the first day. The judge observed that it was unclear whether the group of individuals reportedly denied reentry into the court room did not return because they lacked identification or because they did not wish to comply with the procedure, and that the trial was otherwise well-attended. We therefore are not persuaded that the procedure was overly burdensome on those who wished to attend, particularly in light of the circumstances surrounding the case.

'below that which might be expected from an ordinary fallible lawyer' and [2] prejudices the defendant by depriving him 'of an otherwise available, substantial ground of defence.' " *Lavoie*, 464 Mass. at 89, quoting *Saferian, supra.* Ineffectiveness requires that both prongs are met.

On the first claim, the motion judge determined that trial counsel's frequency of contact with the defendant was not unusual or indicative of incompetence. Trial counsel met with the defendant at the jail on four occasions and at the court house on at least four other occasions, and spoke with the defendant by telephone. Further, the judge concluded that, despite the protective order, the defendant had enough information at his disposal to be adequately informed.

We agree with the motion judge that trial counsel's conduct did not fall measurably below that which would be expected of an ordinary fallible lawyer. See *Saferian*, 366 Mass. at 96. Trial counsel was clearly engaged in the preparation of the defense; he challenged the protective order and successfully had it modified twice. He also hired a private investigator to interview witnesses. During trial, he adequately cross-examined witnesses and raised objections. We cannot say that trial counsel was ineffective in light of these efforts. Cf. *id.* at 94, 97-98 (veteran trial counsel not ineffective despite minimal pretrial preparation because he "was thoroughly accessible to his client during the . . . proceedings").

With respect to the second claim, according to a police report, Chester witnessed "a group of youths . . . wearing light or white color T-shirts" run toward Charlame I, and that one of the individuals had a gun. The defendant asserts that this observation is critical because it is contradictory of the Commonwealth's evidence that the defendant, who was seen running in the opposite direction, was the shooter. In an affidavit, trial counsel states that he was unaware of Chester's potential testimony but would have pursued it had he known about it.

The motion judge concluded that subsequent police reports established that the individuals Chester witnessed were those who had accompanied Dakeem, and therefore that Chester's testimony would not have contributed to the case. She determined that the defendant produced no evidence that Chester "would

have any additional information, much less anything of an exculpatory nature," and rejected the defendant's claim.

We agree with the judge's determination that the defendant did not carry his burden of establishing that counsel's failure to pursue testimony from Chester "likely deprived [him] of an otherwise available, substantial ground of defence." *Saferian*, 366 Mass. at 96. Cf. *Commonwealth* v. *Hudson*, 446 Mass. 709, 724-725 (2006) (no ineffective assistance because no showing that untimely noticed witness would be necessary or helpful, or of "precise contours of the alibi witness's testimony"). Contrast *Commonwealth* v. *Phinney*, 446 Mass. 155, 163 (2006) (trial counsel's failure to review police reports deprived defendant of two grounds of defense).

4. *Request for a continuance.* The defendant argues that the judge abused her discretion in denying trial counsel's request for a continuance, and in essentially affirming this decision in her later denial of the defendant's third new trial motion, because she failed to conduct adequately the required balancing analysis in making such a determination. The Commonwealth asserts that the judge's denial of the request was proper because delay would not have "measurably contributed to the resolution of the case." *Commonwealth* v. *Cruz*, 456 Mass. 741, 748 (2010), quoting *Commonwealth* v. *Miles*, 420 Mass. 67, 85 (1995).

We review the denial of a request for a continuance for abuse of discretion. See *Miles, supra*; *Commonwealth* v. *Cavanaugh*, 371 Mass. 46, 50-51 (1976). "[T]here is no 'mechanical test' for determining whether the denial of a continuance constitutes an abuse of discretion because we must examine the unique circumstances of each case, particularly the reasons underlying the request." *Commonwealth* v. *Pena*, 462 Mass. 183, 190 (2012). A judge should grant a continuance only when justice so requires, balancing the requesting party's need for additional time against concerns about inconvenience, cost, potential prejudice, and the burden of the delay on both the parties and the judicial system. *Commonwealth* v. *Gilchrest*, 364 Mass. 272, 276 (1973). See *Cavanaugh, supra*; Reporters' Notes to Rule 10 (a), Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1418 (Lexis-Nexis 2012-2013).

We are cognizant of a criminal defendant's constitutional

entitlement to assistance of counsel, who "must be afforded 'a reasonable opportunity to prepare and to present the defence.' " *Cavanaugh*, 371 Mass. at 50, quoting *Lindsey* v. *Commonwealth*, 331 Mass. 1, 2 (1954). Therefore, "a trial judge may not exercise [her] discretion in such a way as to impair" this right. *Miles*, 420 Mass. at 85, quoting *Commonwealth* v. *Souza*, 397 Mass. 236, 240 (1986).

The crux of the defendant's request for a continuance stemmed from the restrictions imposed by the protective order on counsel's sharing of discovery materials with the defendant. In essence, trial counsel asserted that he had not had sufficient opportunity to review the discovery materials with the defendant since the protective order required counsel to be physically present at the jail to conduct this review, and therefore that he was unprepared to offer the best defense.

After recounting the specifics of the protective order, the judge expressed doubt that the defendant could not, at least in some instances, identify who had made which statements based on the redacted grand jury minutes made available to him. She stated that the prior motion judges who had preserved and modified the protective order considered some of the same concerns in their rulings. Additionally, she noted that trial counsel had had several opportunities to raise his concern about inadequate preparation prior to the day trial was scheduled to begin but did not do so. The judge then denied the motion for a continuance but informed counsel that if, at any point during the trial, there was testimony for which he was unable to prepare adequately with his client, counsel could request a short continuance. Simultaneously, the judge lifted the protective order to enable trial counsel to provide the defendant with more specific discovery information.

We cannot say that the judge's denial of the defendant's request for a continuance was arbitrary. Contrary to the defendant's suggestion, we do not require that a judge make explicit findings on the record demonstrating that she has balanced the concerns implicated by a potential delay. Given the timing and lack of specificity of counsel's request, we are not convinced that he made a persuasive, case-specific argument for granting a continuance at that juncture. See *Cruz*, 456 Mass. at 748. See

also *Commonwealth* v. *Silva*, 6 Mass. App. Ct. 866, 866-867 (1978) (lack of preparation by counsel may merit denial of continuance request).

Although we acknowledge the challenges involved in preparing a defense when a protective order is in place, the judge appropriately considered the consequences of the order on balance with the court's and the Commonwealth's interests in the efficiency of judicial proceedings. Further, after reviewing the entire record, we are not persuaded that delay here would have contributed measurably to the fair resolution of the case. See *Miles*, 420 Mass. at 85. As the defendant acknowledges, his trial counsel was experienced. Even more telling is the fact that counsel never invoked the judge's offer to "suspend testimony" to conduct more investigation. The denial of the continuance was not an abuse of discretion and resulted in no measurable detriment to the presentation of a defense.

5. *Admissibility of the defendant's statements.* The defendant also challenges the denial of his motion to suppress statements he made to the police in an interview on July 12, 2004.[8] We conclude that the motion judge did not err, because the Commonwealth met its burden of proving that the defendant knowingly and voluntarily waived the rights afforded under *Miranda* v. *Arizona*, 384 U.S. 436, 479 (1966), and that his statements were voluntary.

For context, we describe the defendant's first interview with the police, on June 11, 2004, and note that the defendant does not challenge the denial of his motion to suppress statements made during this interview.[9] The day following the shooting, officers were called to English High School and interviewed

___

[8]In relation to this claim, the defendant emphasizes that the conversation he had with the police on July 12, 2004, was not recorded. In *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-448 (2004), we held that where "there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (on request) to a jury instruction" indicating our preference that interrogations be recorded and cautioning the jury to weigh such evidence "with great caution and care." Such an instruction was requested and provided in this case.

[9]This factual summary is derived from the motion judge's factual findings, which are based on the testimony of five witnesses at the motion to suppress hearing; the form stating the Miranda warnings to a juvenile that was signed by the defendant on June 11, 2004; and a document summarizing the defend-

Tatiana Magazine, who had informed school officials that she had useful information. Their conversation with Magazine led them to interview the defendant, who at the time was just over one month shy of his seventeenth birthday.

The school principal had telephoned the defendant's mother and asked her to come to the school because the police planned to interview her son. When she arrived, she joined her son, the principal, and the special education coordinator in the co-ordinator's office. Two officers provided the defendant with the Miranda warnings and gave the defendant and his mother the opportunity to discuss the Miranda warnings form outside the officers' presence. Both mother and son signed the form, a copy of which was admitted in evidence at the motion to suppress hearing. At the hearing, the motion judge concluded that there was a voluntary waiver and denied the suppression request.

The defendant's second interview with the police occurred one month later, on July 12. That day, police officers who were members of the youth violence strike force encountered the defendant and, after a lawful pat-down, arrested him for marijuana possession. They then brought the defendant to the strike force headquarters, in accordance with a policy of debriefing arrestees for information about issues in the area.

At the time of the interview, the defendant was four days shy of his seventeenth birthday. One of the officers provided him with Miranda warnings and reportedly obtained a signed waiver, although the Miranda form could not be located. During the interview, only the defendant and two officers apparently were present. The officers attempted to contact the defendant's mother, but she did not arrive until after the interview began. After an evidentiary hearing on the defendant's motion to suppress, the judge concluded that the defendant had knowingly, voluntarily, and intelligently waived his Miranda rights, for reasons discussed below.[10]

---

ant's experience with the court system. The defendant's account in this interview of what happened on the day of the murder, which was admitted at trial through the testimony of two police officers, was contradicted by the testimony of Richard Nichols and Jonathan Rogers.

[10] At trial, the defendant's statements in this interview, which were admitted through the testimony of an officer, provided a very different account of his conduct on the day of the shooting than the account he gave on June 11, which also was admitted.

On appeal, the defendant challenges only the denial of his motion to suppress the statements made on July 12.[11] "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002).

To admit statements made during a custodial interrogation, the Commonwealth bears the "heavy burden" of proving beyond a reasonable doubt that the defendant's waiver of the Miranda rights was voluntary, knowing, and intelligent. See *Commonwealth* v. *Magee*, 423 Mass. 381, 384, 386 (1996); *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995).

Where a juvenile is between fourteen and seventeen years of age, we generally require that the juvenile have a "genuine opportunity" for "meaningful consultation with a parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent." *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 380 (2003), quoting *Commonwealth* v. *MacNeill*, 399 Mass. 71, 78 (1987), and *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134 (1983). See *Commonwealth* v. *Trombley*, 72 Mass. App. Ct. 183, 186 (2008) (defendant no longer entitled to interested adult protections at age seventeen). Actual consultation is not required, but the opportunity for consultation must be "immediately and evidently available to the juvenile before the juvenile waives his or her rights." *Alfonso A.*, *supra* at 382. Where a juvenile has not been afforded such an opportunity, "the Commonwealth must make the alternative showing of 'circumstances [demonstrating] a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile.' "[12] *Id.* at 384, quoting *A Juvenile*, *supra*.

---

[11]The defendant also asserts that on July 12, 2004, when he was arrested for marijuana possession and subsequently questioned about the shooting, he was not afforded an opportunity to make a telephone call within one hour of his arrest, in violation of G. L. c. 276, § 33A. The defendant has not met his burden of establishing that this denial was intentional, nor has he demonstrated that, if this denial were indeed in error, it gave rise to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Scoggins*, 439 Mass. 571, 577-578 (2003); *Commonwealth* v. *Johnson*, 422 Mass. 420, 429 (1996).

[12]Among the circumstances that can inform whether there was a valid

Here, the motion judge correctly determined that the defendant was not afforded a genuine opportunity to consult with an interested adult. Cf. *Alfonso A.*, 438 Mass. at 382-383 (officers' repeated offers to contact juvenile's mother or to permit consultation with other adults present where he was detained, none of whom he knew well, did not rise to level of providing genuine consultation opportunity). However, we agree with the motion judge that the Commonwealth met its burden in making an alternative showing.

In reaching this conclusion, we defer to the judge's credibility determinations regarding the testimony provided at the hearing. See *Commonwealth* v. *Clarke*, 461 Mass. 336, 341 (2012). As a threshold matter, she found credible the detective's testimony that he gave the defendant the Miranda warnings and that the defendant provided a knowing and voluntary waiver, even though the written Miranda waiver form could not be located.[13] In addition, she concluded from the testimony that the defendant had had prior experience and familiarity with the judicial system.[14]

Turning to the evidence before the judge, we confirm the significance of the defendant's June 11 Miranda waiver during the police interview at his school[15] and of the proximity of his seventeenth birthday. This evidence, coupled with the defend-

waiver are the "conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency . . . , and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

[13]The defendant avers that the Commonwealth's inability to produce a copy of the Miranda form provided to the defendant on July 12 is a strong indicator that his waiver was not valid. We do not find this fact to be dispositive in light of other indications that the defendant provided a knowing and voluntary waiver. See *Commonwealth* v. *Ortiz*, 435 Mass. 569, 577 (2002) (defendant may make valid oral waiver).

[14]The defendant had been arrested in 2003 for drug possession and on an outstanding Department of Youth Services warrant. Counsel had been appointed for those matters and for other charges previously brought in the Juvenile Court.

[15]As evidence that the defendant understood the Miranda rights, the motion judge specifically emphasized the features of the June 11 interview, where the defendant thoroughly was advised of his rights, and where the defendant seemed to understand his rights by indicating during the course of the interview that he thought he should speak to an attorney, at which point the interview ended.

ant's other experience with the criminal justice system, was sufficient to establish that his waiver was knowing and voluntary. See *Commonwealth* v. *King*, 17 Mass. App. Ct. 602, 602, 603, 610-611 (1984) (sixteen year old defendant capable of waiving *Miranda* rights because of prior involvement with court system, recent exercise of right to counsel after consultation, and low-pressure environment during questioning).

We inquire separately whether the defendant's statements were made voluntarily. *Edwards*, 420 Mass. at 673. See *Commonwealth* v. *Scoggins*, 439 Mass. 571, 576 (2003). A voluntary statement is one that, in addition to considering the totality of the circumstances in the waiver analysis, "was not the product of inquisitorial activity which had overborne [the defendant's] will." *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976).

The testimony at the suppression hearing was that the tenor of the interview was calm and open and that the interview occurred in a community conference room belonging to the youth strike force. The defendant appeared to understand the questions the officers asked and did not express a desire to end the interview or exhibit any signs of being under the influence of drugs or alcohol. Although we are cognizant of the limitations of our ability to assess the interrogation techniques employed in the debriefing due to the lack of a recording, see *Scoggins*, 439 Mass. at 576, we are persuaded that the circumstances surrounding the statements, as found by the judge, support the conclusion that the defendant's statements were made voluntarily. Because we conclude that the defendant's waiver and statements were voluntarily made, there was no error in admitting them at trial.

6. *Galloway's cross-examination.* At trial, the Commonwealth objected to trial counsel's effort to impeach Grady's grand jury testimony (that he saw the defendant in the alley with the gun) by asking Galloway whether Grady told him at the time that Grady did not know who the person with the gun was. The context is as follows.

During his cross-examination of Grady at trial, trial counsel asked Grady, "[D]o you have a recollection of Stephen Galloway coming up to you that night and asking you if you saw the

person who did the shooting, and your answer was, 'I don't know him?' " Grady essentially answered that such a conversation never occurred because he and Galloway were together at a party that night and not at the scene of the shooting.

The basis for trial counsel's question was the grand jury testimony of Galloway about what occurred in the alley near Humboldt Court and Hazelwood Court right after Grady confronted the shooter. In that testimony, Galloway testified, "I asked [Grady] who was that. He told me he don't know."

On direct examination at trial, Galloway testified to what he had observed on the night of the shooting but was not asked about any conversation with Grady in the alley. On cross-examination, trial counsel asked Galloway if he had asked Grady who the shooter was, and at first Galloway denied doing so. Trial counsel then refreshed Galloway's recollection with the minutes of his grand jury testimony, and asked whether his "memory [was] refreshed as to whether or not Mr. Grady said anything to [him] at that point in the alley." Galloway responded, "Yes." Trial counsel then asked, "[H]e did say something to you, didn't he?" to which the witness again responded, "Yes." When trial counsel began his next question with, "And he told you that," the Commonwealth objected on hearsay grounds, and a sidebar conference ensued.

At sidebar, trial counsel immediately offered a workaround to the potential hearsay problem.[16] Accordingly, the judge did not

---

[16]The following excerpt from the sidebar discussion illustrates counsel's proposed workaround:

THE JUDGE: "I don't know exactly why Kyrice [Grady's] statement is admissible. For what purpose are you seeking to have that statement admitted, Kyrice's statement to this witness?"

DEFENSE COUNSEL: "I'll put it this way. I'll go at it another way. I'll simply ask him, as a result of what Kyrice said, did you now know who the shooter was?"

THE JUDGE: "Well, that's a backdoor way of getting it in."

DEFENSE COUNSEL: "It's backdoor, but still, I think it's admissible. . . . And then I'm not asking him what he said."

THE PROSECUTOR: "Well, I would object to it. . . ."

. . .

rule on the Commonwealth's objection, and permitted trial counsel to proceed to question the witness in the manner he proposed at sidebar. The Commonwealth's objection to the proposed questioning was overruled, but the parties agreed that

THE JUDGE: "At any rate, you can ask him, in fact, having read those grand jury minutes, do you now recall that you did ask Kyrice who it was. And then — and he can say 'yes,' if he did. And then, what's the next question?"

DEFENSE COUNSEL: "As a result of that did you know who it was?"

THE JUDGE: "Yes or no? Okay. [Commonwealth], is that all right?"

THE PROSECUTOR: "I would object for the record . . . ."

THE JUDGE: "[I]f there's no reason to get in the statement, I don't know that it's fair to backdoor it. He doesn't know who it was based on his own personal knowledge, and if you're objecting . . . . Are you objecting or not?"

THE PROSECUTOR: "I am, your honor. It's the inference that's drawn from the statement that's not admissible. . . ."

. . .

DEFENSE COUNSEL: "I won't get into the statement about Kyrice Grady. I'll simply ask him did he have a conversation with Grady? Yes. . . . And as a result of the conversation with Grady did you now know who that person was —"

THE JUDGE: "Well, that basically backdoor's [*sic*] the contents of the statement which is that Kyrice told him he didn't know. . . ."

. . .

THE JUDGE: "I guess the question is whether the statement itself is admissible. And the account you want to have admitted here is Kyrice Grady saying it was the defendant; that he recognized the defendant and that he now — he's saying to somebody else that he didn't know who it was. Then that's impeaching that account which is, we're assuming, pretty much the account he gave on direct examination since that was the grand jury testimony that served as his direct examination."

THE PROSECUTOR: "[I]f the Court is inclined to say that this falls within that area where it is coming in for impeachment . . . I would request some instruction that it's coming in for impeachment purposes only and not —"

DEFENSE COUNSEL: "I have no objection to that. . . ."

THE JUDGE: "Okay. So you're going to ask him what Kyrice told him?"

the purpose of the questioning was to impeach the credibility of the account given by Grady in his grand jury testimony, and that the judge should give a brief instruction to that effect.

Trial counsel then continued his cross-examination of Galloway, asking whether he and Grady had a conversation in the alley "immediately after the shooting" and after he "saw this person face to face with Mr. Grady." Galloway responded that he did. Trial counsel then asked, "[A]s a result of that conversation . . . did you learn who the shooter was?" Galloway answered, "No." The judge explained to the jurors that statements that people make outside of the court room, and not therefore subject to cross-examination, are generally excluded because they are hearsay, but that there are exceptions to that rule. The judge stated, "One of the . . . exceptions is we let in [hearsay] statements that perhaps could be considered inconsistent with the testimony [a] witness has given under oath." The judge explained that those statements are admissible for a "very limited purpose, which is simply to help [the jury] assess the credibility of [a] witness's testimony under oath." The judge went on to explain, "[W]ith respect to Mr. Grady, it's his testimony before the grand jury versus his testimony here so . . . you're trying to assess his credibility in two different locations."

In these circumstances we decline to address the merits of the defendant's argument on appeal that one of several hearsay exceptions would have permitted the introduction, even without the workaround, of the statement Galloway would have testified that Grady made to him.[17] We grant a trial judge broad discretion in determining whether a hearsay exception applies. See,

---

DEFENSE COUNSEL: "No. I won't ask him what he told him. 'Did Kyrice tell you something?' 'Yeah.' 'As a result of what he told you' —"

THE JUDGE: "Okay. . . . We'll leave it at that and then you want me to give a limiting instruction?"

THE PROSECUTOR: "Yes. Very briefly."

[17]The defendant avers that Grady's statement to Galloway was admissible not only for impeachment purposes, but also substantively under three hearsay exceptions: excited utterances, declarations of mental condition, and statements concerning identity.

e.g., *Commonwealth* v. *King*, 436 Mass. 252, 254-255 (2002). Because trial counsel did not raise any of these exceptions at trial, the record is too undeveloped as to the nuanced assessments necessary for us to determine whether an exception would have applied. In any event, we discern no abuse of discretion in how the judge handled the matter. Additionally, trial counsel's decision to pursue this questioning of Galloway did not create a substantial likelihood of a miscarriage of justice. On cross-examination, Galloway essentially testified that immediately after the shooting, he had a conversation with Grady, and from that conversation did not learn the identity of the shooter. From this exchange, the jury could have inferred that Grady did not recognize the shooter that night in the alley, an argument trial counsel underscored in his closing. Had trial counsel been permitted to ask Galloway specifically what Grady said to him, he would have achieved effectively the same result. We are not persuaded that this strategy was "manifestly unreasonable" or "influenced the jury's conclusion" to the defendant's detriment. See *Commonwealth* v. *Silva*, 455 Mass. 503, 526 (2009), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998), and *Commonwealth* v. *Wright*, 411 Mass. at 682.

7. *Sleeping juror.* The defendant's final argument is that the judge erred in permitting a juror who had appeared to be asleep at numerous times during trial to participate in deliberations. He asserts that this is a structural defect because it infringes on his constitutional right to an impartial jury under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He further argues that trial counsel was ineffective in failing to suggest to the judge the appropriate procedure for addressing a sleeping juror. We agree with the Commonwealth that the judge did not abuse her discretion in permitting the juror to deliberate, and further conclude that counsel was not ineffective in his approach to this issue.

The right to a fair trial is indeed paramount. See *Commonwealth* v. *Rock*, 429 Mass. 609, 614 (1999). However, we afford considerable discretion to the trial judge to determine whether removal of a juror is merited. See *Commonwealth* v. *Stokes*, 440 Mass. 741, 751 (2004), quoting G. L. c. 234A, § 39 (judge has discretion to dismiss juror "in the best interests of justice").

During trial, the judge and both counsel observed a juror appear to be sleeping at various points. Prior to resting its case, the Commonwealth requested that the juror be made an alternate, and trial counsel objected. Trial counsel also objected to the judge's decision to question the juror about his behavior and his ability to participate in deliberations. The judge conducted a voir dire of the juror and satisfied herself that he could fairly participate in deliberations.[18] See *Commonwealth* v. *Braun*, 74 Mass. App. Ct. 904, 905 (2009) (requiring such questioning of sleeping juror). There was no error or abuse of discretion in this determination. See *Commonwealth* v. *Hernandez*, 63 Mass. App. Ct. 426, 433-434 (2005) (unnecessary to dismiss juror when he assured judge that he had heard evidence).

8. *Sentencing.* In light of the holding of the United States Supreme Court in *Miller*, 132 S. Ct. at 2460, the defendant asks us to vacate his sentence and remand for further proceedings. In *Miller, supra,* the Court held that a mandatory sentence of life in prison without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution when imposed on individuals who were under the age of eighteen at the time they committed the murder. In *Diatchenko*, 466 Mass. at 655, 658, 661, 666, we determined that *Miller* announced a new rule that applies to cases still pending on direct review and retroactively to cases on collateral review. In addition, we concluded that both the mandatory and discretionary imposition of such a sentence on juvenile homicide offenders violates the "cruel or unusual punishment" prohibition in art. 26 of the Massachusetts Declaration of Rights. *Diatchenko, supra* at 658-659, 671.

The defendant here was found guilty of murder in the first degree as defined by G. L. c. 265, § 1. He was accordingly sentenced to imprisonment in State prison for life without the possibility of parole under G. L. c. 265, § 2. At the time of the murder, the defendant was sixteen years of age. Pursuant to our

---

[18]The juror indicated that although he may have nodded off, he was never in a deep sleep. The security guards woke him up and the other jurors nudged him, and the juror thought that he essentially heard all the evidence in the case. After the conversation, the Commonwealth remarked that the questioning was thorough and there did not appear to be any reason to discharge the juror. Trial counsel did not contest the judge's determination.

holding in *Diatchenko*, 466 Mass. at 658-659, the defendant's life sentence remains in force, but the exception in G. L. c. 265, § 2, rendering him ineligible for parole, no longer applies. The defendant is eligible for parole in accordance with the terms of G. L. c. 127, § 133A.[19] We therefore decline to vacate the defendant's convictions but remand this case to the Superior Court for resentencing consistent with *Diatchenko*. See *Commonwealth* v. *Brown*, 466 Mass. 676, 677-678 (2013).

9. *General Laws c. 278, § 33E.* We have reviewed the entire record and discern no reason, other than the reduction in sentence discussed above, to exercise our powers under G. L. c. 278, § 33E.

*Conclusion.* In sum, we reject the defendant's arguments that the motion judges and trial judge erred or abused their discretion, and that trial counsel was ineffective in myriad ways. We affirm the defendant's convictions and the denial of his motions for a new trial, and remand to the Superior Court for a reduction in sentence consistent with *Diatchenko*, 466 Mass. at 658-659, and this opinion.

*So ordered.*

---

[19]As we noted in *Diatchenko* v. *District Attorney for the Suffolk Dist.*, 466 Mass. 655, 673-674 (2013), the exception to parole eligibility stated in G. L. c. 127, § 133A, which excludes individuals serving a life sentence for murder in the first degree from parole eligibility, is invalid as applied to juvenile homicide offenders.