MAINE SUPREME JUDICIAL COURT                           Reporter of Decisions
Decision:      2014 ME 125
Docket:        And-13-398
Argued:        September 10, 2014
Decided:       November 6, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, JABAR, and HJELM, JJ.

# DANIEL P. ROBERTS

v.

# STATE OF MAINE

SILVER, J.

[¶1]  Daniel P. Roberts appeals from an order of the Superior Court (Androscoggin County, *Wheeler, J.*) denying his petition for post-conviction review.  Because we conclude that Roberts's Sixth Amendment right to a public trial was not violated during any stage of his 2007 murder trial, we affirm.

## I. FACTUAL BACKGROUND

[¶2]  In December 2005, Roberts was indicted for the murder of Melissa Mendoza, the mother of his child.[1]  Roberts pleaded not guilty, and the case

---

   [1]  Roberts and Mendoza had a daughter who was about two years old at the time of the killing.  The couple was engaged in a contentious custody dispute regarding the child.  Mendoza, who lived in California, had previously taken the child out of the state in violation of a court order but had returned to Maine and was staying in a local hotel while she attempted to have the court's order modified.  Mendoza made numerous phone calls to Roberts on the night of August 14, 2005, and into the early morning hours of August 15, 2005.  Around 1:30 a.m., she arrived at Roberts's home and entered through a garage door.  Roberts, who was waiting for her in the garage, shot her in the back of the head as she moved toward the house.  He told police—and his defense team argued at trial—that he shot Mendoza in self defense and in defense of his daughter because Mendoza had stolen one of his handguns, was armed with it when she entered the garage, and threatened to kill or kidnap the child.

2

proceeded to trial in February 2007. The jury returned a guilty verdict on February 27, 2007. In March 2007, Roberts filed a motion to dismiss the indictment and vacate the conviction based on alleged misconduct by grand jurors; the motion was denied. On June 29, 2007, Roberts was sentenced to fifty-five years in prison and was ordered to pay $4500 as restitution for Mendoza's funeral expenses. In August 2007, Roberts appealed.[2] We affirmed the conviction on July 8, 2008. *See State v. Roberts*, 2008 ME 112, 951 A.2d 803.

[¶3]　Roberts filed a *pro se* petition for post-conviction review on July 2, 2009, alleging that he received ineffective assistance from trial counsel. He submitted an amended petition through counsel in December 2010, and he filed a supplemental amended petition in March 2011. An evidentiary hearing was held in the Superior Court in December 2011.

A.　Jury Selection

[¶4]　Prior to jury selection, Roberts's defense counsel filed a motion in limine requesting that questioning of individual jurors take place outside of the

---

[2] On appeal, Roberts argued that the trial court improperly admitted a photograph showing Mendoza smiling and kissing the child, affidavits attached to Mendoza's request for a protection from abuse order against Roberts, and evidence that Mendoza's rental vehicles and the vehicles of a visit supervisor were vandalized shortly before the murder. *State v. Roberts*, 2008 ME 112, ¶¶ 22, 23, 27, 31, 951 A.2d 803. Roberts also argued that the court improperly excluded evidence of a prior consistent statement by Jaime Bolduc, a witness who testified that Mendoza told her that if she had a gun, she would kill Roberts. *Id.* ¶¶ 36-37. Roberts further argued that the jury instructions impermissibly lowered the mens rea element and that the State should have been required to prove that Roberts actually knew that Mendoza was not about to use deadly force or commit a kidnapping. *Id.* ¶ 40. Finally, Roberts argued that the State engaged in prosecutorial misconduct by suggesting in its closing argument that the theory that Mendoza was going to kidnap the child had been recently fabricated by the defense. *Id.* ¶ 44.

presence of other jurors.  He also asked that several non-attorney consultants, a second attorney, and up to two trial assistants be permitted to attend voir dire. Roberts also requested that he be permitted to personally address prospective jurors during the voir dire process.

[¶5]   The court addressed the process for conducting voir dire during a motion hearing on January 30, 2007, at which Roberts was present and represented by counsel.  The court explained that general voir dire would be conducted in open court and that jurors who had been exposed to information about the case or expressed a possible bias would then be questioned individually.  Topics to be explored during individual voir dire included, among other things, jurors' views regarding drugs and alcohol, whether they had any personal experience with domestic violence, and whether they had previous experience in the court system as a party, witness, complaining witness, or victim.

[¶6]   The court indicated, "[T]he question is whether [the individual voir dire is] done at sidebar or whether it's done in chambers," to which defense counsel responded, "I would prefer that it be done in chambers, Your Honor." Defense counsel further stated that Roberts was entitled to be present in chambers during the individual voir dire and said, "I would also ask for other people to be present as well."  The court acknowledged that defense counsel had previously requested that "a number of people" be present during individual voir dire but

4

expressed concern about having enough space in chambers to accommodate them. Further, the court explained, "I don't believe that all of that is necessary. What I will permit is one of your jury selection people to attend with you . . . and one co-counsel." Defense counsel said, "We don't object to obviously having them in chambers, and I don't object to limiting it to my co-counsel[,] one juror counselor and my client."

[¶7] Consequently, during jury selection, individual voir dire was conducted in chambers with no members of the public present; defense counsel was accompanied by co-counsel and one jury-selection consultant. The court advised each of the forty-nine prospective jurors questioned in chambers that everyone present had an obligation to keep confidential any information that was divulged during the individual voir dire. At no time did Roberts object to this procedure.

B.    Courthouse Screening

[¶8] During the trial, a sign was posted at the front entrance of the courthouse indicating that anyone wearing colors, logos, or insignia associated with any fraternal organization would not be allowed inside. The purpose of this screening policy was to prevent the jury from being exposed to any suggestion that Roberts was affiliated with the Hell's Angels. Roberts did not object to this procedure; on the contrary, it was implemented with his knowledge and consent. The court informed counsel that it was implementing the process in order to

prevent the colors or insignia from being displayed anywhere that the jury could see them, to which defense counsel jokingly responded that he would "strangle anyone [who] did that anyway."

[¶9] One day while the trial was in session a judicial marshal asked a Roberts supporter to remove his T-shirt before entering the courthouse because the shirt displayed a Harley Davidson logo. The supporter removed the shirt, turned it inside out, and put it back on; he was then permitted to enter the courthouse. No members of the public were excluded as a result of the screening policy.

C.      Limitations on Entry to the Courtroom During Trial

[¶10] Defense counsel requested during a conference in chambers that the victim's family be removed from the courtroom during the presentation of certain evidence—specifically, the playing of a recording of a phone call between the victim and Roberts—because they were holding each other and visibly crying into handkerchiefs, which defense counsel feared could unfairly prejudice Roberts. The court declined to ask them to leave the courtroom but did consider various options, including having a victim advocate ask them to be more aware of their behavior and possibly asking them to move to a less visible location in the courtroom. The court concluded, however, that the best option would be to simply adjourn for the day, noting that Roberts's family and friends had engaged in distracting behavior as well, including tapping other spectators on the shoulder as

6

they got up to leave the courtroom during witnesses' testimony.  Once the jury was

excused, the court addressed the spectators, saying,

> I would like everyone to stay in the courtroom just for a minute so I can give some general instructions about courtroom demeanor, both during sessions and in between sessions.  So I'm going to ask that people remember they're in a courtroom, they're in a courthouse.  Their behavior should be in accordance with . . . the solemnity that should be attached to a courthouse. . . .  I'm asking all of you here who are attending the trial on a daily basis that you treat each other civilly, and I do not want any eruptions or anything else to happen.  If that does happen I will have to remove people from the courtroom. . . . I treat the court with utmost respect, and I expect anyone who is here to do the same.

[¶11]  Later in the trial, the court again discussed with counsel the problem

of distracting activity occurring in the audience during the presentation of

evidence.  The court addressed both defense counsel and the State at sidebar,

saying,

> I am concerned, and I could speak to the attorneys or I could speak to the whole audience after the jury leaves, but I would ask each of you to talk to your sort of fan clubs back there.  During the tape recording [of the phone call between the victim and Roberts] your victim advocate was not there . . . and the [victim's] mother was having a difficult time. . . . On your side a young blond woman came in and acted sort of like this was a wedding or something. . . . [S]he gave [Roberts's father] a big hug and then she gave a woman across the front of the bench a big hug and she turned and waved to other people. I think you just need to talk to the principal people who are here and make sure they reign in their behavior. . . . I'll ask each of you to talk to the people . . . about the right of the jury to make a decision . . . independent of being affected by what members of the audience are doing.

[¶12]   At some point during the trial, judicial marshals began requiring spectators to wait until a break in the presentation of evidence before entering the courtroom.  Defense counsel was not specifically made aware that this procedure was being implemented.  One Roberts supporter explained that she was excluded from the courtroom while "proceedings [were] going on" because "the judge had stated one day in court that too many people were going in and out and it was distracting people."  According to the Roberts supporter, the trial judge made this statement while both Roberts and the jury were absent from the courtroom. Several of Roberts's supporters testified at the post-conviction hearing that they were not permitted to enter the courtroom while witnesses were testifying. Spectators who arrived after the trial had begun for the day were required to wait in a side room until there was a break in the proceedings.  Similarly, spectators who left the courtroom during testimony were not permitted to reenter until there was a break.  The time they were required to wait varied from only a few minutes to more than twenty minutes.

D.     The Return of the Verdict

[¶13]   On its first day of deliberations, the jury asked for read-backs of several portions of testimony and reviewed videos and recordings that had been offered during the trial.   After rehearing certain evidence, the jury resumed deliberations at 4:26 p.m.  The record does not reflect at what time the jury notified

8

the court that it had reached a verdict. At 4:54 p.m., the jury returned to the courtroom. It announced its verdict, and the court excused the jury at 4:58 p.m.

[¶14] Several of Roberts's supporters, upon being informed that the jury had reached a verdict, went to the courthouse and tried to get in. They believed that the court would allow thirty minutes for spectators to arrive before having the jury announce the verdict. When they arrived, however, the doors to the courthouse were locked. A court officer explained at the post-conviction hearing that a county employee typically locks the courthouse doors at 5:00 p.m., and that he recalled seeing an employee lock the door around that time on the day of the verdict. The Roberts supporters who testified that they were unable to get in were unsure of what time they arrived at the courthouse. They observed members of the victim's family being escorted out of the courthouse after the verdict had been announced.

## II. PROCEDURAL BACKGROUND

[¶15] On August 17, 2012, the court issued a forty-six-page order denying Roberts's petition. With regard to jury selection, the court concluded that defense counsel had waived any objection to the closure on Roberts's behalf. The court found that this was a tactical decision by defense counsel that did not constitute ineffective assistance of counsel. The court concluded that Roberts had failed to show cause for failing to object at trial and for failing to raise the issue on direct

appeal and that, therefore, he was precluded from raising the issue on post-conviction review. With respect to the screening procedure, the court found that Roberts consented to the process through counsel and had not shown cause for his failure to object. Additionally, the court noted that the screening process was undertaken in order to protect Roberts's interests by preventing the jury from being exposed to any prejudicial suggestion that he was affiliated with the Hell's Angels.

[¶16] The court further concluded that the exclusion of late arrivals from the courtroom did not amount to even a partial closure. The court went on to explain that, even assuming that the restrictions on entry during testimony did amount to a partial closure, such a closure was too trivial to implicate Roberts's Sixth Amendment rights. Finally, the court found as fact that the courthouse doors were not locked before the verdict was announced at 4:54 p.m. and that those spectators who were unable to enter must have arrived shortly after 5:00 p.m.

[¶17] On August 12, 2013, the court issued a supplemental order to address arguments it had overlooked in its previous order, and again denied Roberts's petition. Roberts appealed, and we issued an order granting a certificate of probable cause and permitting full review on two issues: whether the post-conviction court erred in determining that the trial court did not violate Roberts's right to a public trial when it closed portions of voir dire, and whether

the post-conviction court erred in determining that no courtroom closure occurred during the trial.

## III. DISCUSSION

[¶18] Decisions whether to close court proceedings to the public frequently involve the balancing of three important interests: the First Amendment rights of the press and members of the public, the defendant's right to a public trial, and the interest of both the State and the defendant in ensuring an impartial jury and a fair trial. *See In re Maine Today Media, Inc.*, 2013 ME 12, ¶ 3, 59 A.3d 499. This appeal requires us to weigh Roberts's personal right to a fair and public trial with the trial court's responsibility to manage the proceedings and maintain order. As this case demonstrates, these interests are not necessarily incompatible. On the contrary, the trial court's management of the courtroom is undertaken with the goal of ensuring the fairness and impartiality of the trial.

[¶19] The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial" by an impartial jury. The Sixth Amendment's public trial guarantee "is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quotation marks omitted);

*see also Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979); *In re Oliver*, 333 U.S. 257, 270 n.25 (1948). The goals advanced by the public-trial guarantee are "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Braun v. Powell*, 227 F.3d 908, 918 (7th Cir. 2000) (quotation marks omitted). With these principles in mind, we address each of Roberts's arguments.

A.    Conducting Voir Dire in Chambers

[¶20] We must first determine whether Roberts is procedurally defaulted from raising this issue on post-conviction review. The post-conviction court concluded that defense counsel effectively waived Roberts's Sixth Amendment rights relating to the voir dire of individual jurors, and that doing so did not constitute ineffective assistance of counsel. Roberts argues that no waiver occurred, that trial counsel's failure to object constituted ineffective assistance of counsel, and that appellate counsel's performance was similarly deficient for failing to raise the issue on appeal.

[¶21] We review questions of law de novo, *Alexandre v. State*, 2007 ME 106, ¶ 14, 927 A.2d 1155, and "apply a deferential standard of review to the findings of a post-conviction court." *Francis v. State*, 2007 ME 148, ¶ 5, 938 A.2d 10. Generally, errors at trial that could have been raised on direct appeal

12

may not be raised in an action for post-conviction review. 15 M.R.S. § 2128(1) (2013). However, "[t]he assertion of a right under the Constitution of the United States may not be held waived by its nonassertion at trial or on appeal if the assertion of the right would be held not waived in a federal habeas corpus proceeding brought by the convicted or adjudicated person pursuant to [28 U.S.C.A. §§ 2241-2254]." 15 M.R.S. § 2128-A (2013). Thus, we turn to federal case law to determine whether Roberts's Sixth Amendment claim would be deemed waived in a federal habeas corpus proceeding.

[¶22] Typically, a habeas petitioner is entitled to collateral relief on a Sixth Amendment claim only if he can show both (1) cause for having procedurally defaulted his claim, and (2) actual prejudice resulting from the alleged error. *Bucci v. United States*, 662 F.3d 18, 29 (1st Cir. 2011). Because a total closure of the courtroom during jury selection is a structural error,[3] however, a petitioner is not required to demonstrate actual prejudice resulting from such a closure. *Owens v. United States*, 483 F.3d 48, 64 (1st Cir. 2007). Thus, we will consider

---

[3] As the post-conviction court noted, it remains an open question whether a partial courtroom closure is a structural error. A partial closure occurs where "courtroom access is restricted but some members of the public are permitted to attend"; a total courtroom closure occurs where "all members of the public [are] excluded during some phase of the trial." *Bucci v. United States*, 662 F.3d 18, 23 (1st Cir. 2011); *see also Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001) ("Nowhere does our precedent suggest that the total closure of a courtroom for a temporary period can be considered a partial closure, and analyzed as such."). Here, a total closure—albeit a brief one—occurred when the court conducted individual voir dire in chambers.

the merits of Roberts's argument that his Sixth Amendment rights were violated during jury selection if he can demonstrate cause for his procedural default.

[¶23] A showing that counsel was constitutionally ineffective is sufficient to show cause for failure to raise an issue at trial and may allow a petitioner for post-conviction review to avoid a procedural default. *See Owens*, 483 F.3d at 63. "To prove ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 57 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)) (quotation marks omitted). "The question is whether the counsel's performance fell within the wide range of reasonable professional assistance that a competent criminal defense counsel could provide under prevailing professional norms." *Bucci*, 662 F.3d at 29-30 (quotation marks omitted). The *Strickland* test "compels us to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Morales v. United States*, 635 F.3d 39, 44 (2d Cir. 2011) (quotation marks omitted). "We will not overturn a post-conviction court's determination as to the effectiveness of trial counsel unless it is clearly erroneous and there is no competent evidence in the record to support it." *Gauthier v. State*, 2011 ME 75, ¶ 13, 23 A.3d 185 (quotation marks omitted).

[¶24] "[T]he right to an open trial may give way in certain cases to other rights or interests. . . . Such circumstances [are] rare, however, and the balance of

interests must be struck with special care." *Waller*, 467 U.S. at 45. The United States Supreme Court has articulated four criteria that a trial court must find are met before it may exclude the public from proceedings in a criminal trial: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced," (2) "the closure must be no broader than necessary to protect that interest," (3) "the trial court must consider reasonable alternatives to closing the proceeding," and (4) "it must make findings adequate to support the closure." *Id.* at 48.

[¶25] For purposes of the Sixth Amendment, jury selection is an essential part of "the trial." *Presley v. Georgia*, 558 U.S. 209, 213 (2010) ("[T]he Sixth Amendment right to a public trial extends to the voir dire of prospective jurors."); *State v. Pullen*, 266 A.2d 222, 228 (Me. 1970), *overruled on other grounds by State v. Brewer*, 505 A.2d 774 (Me. 1985); *see also Owens*, 483 F.3d at 63 ("Jury selection is, of course, a crucial part of any criminal case."). A trial court is constitutionally required to consider alternatives to closure before it may exclude members of the public from voir dire. *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 511 (1984).

[¶26] We are nevertheless unpersuaded by Roberts's contention that trial counsel acted incompetently by requesting that individual voir dire be conducted in chambers. This appeal concerns only Roberts's right to a fair and public trial; it

does not implicate the rights of the press or the public. Because the right at issue is personal to Roberts, it can be forfeited. *See Henderson v. United States*, 133 S.Ct. 1121, 1126 (2013) ("[N]o procedural principle is more familiar to this Court than that a constitutional right . . . may be forfeited in criminal . . . cases by the failure to make timely assertion of the right . . . ."); *see also Fryetag v. Comm'r of Internal Revenue*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring) ("To abandon that principle is to encourage the practice of 'sandbagging': suggesting or permitting, for strategic reasons, that the trial court pursue a certain course, and later—if the outcome is unfavorable—claiming that the course followed was reversible error."). It is true that a "presumption of openness" attaches to every stage of a criminal trial, including jury selection, and that the presumption may be overcome only by "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co.,* 464 U.S. at 510. The defendant's right to a fair trial, however, is one of the several interests that can justify overriding the defendant's interest in a public trial. *Waller*, 467 U.S. at 45.

[¶27] As the post-conviction court found, trial counsel's approach was entirely consistent with the prevailing professional norms in Maine's criminal defense bar and trial courts at the time. *See, e.g., State v. Moody*, 486 A.2d 122, 126 (Me. 1984) (concluding that the trial court "abused [its] discretion in declining

to ask [certain] questions in a private setting"). Further, "while criminal defendants are entitled to competent representation, the Constitution does not [e]nsure that defense counsel will recognize and raise every conceivable constitutional claim." *Bucci*, 662 F.3d at 31 (quotation marks omitted). This is particularly true where, as here, pressing a constitutional claim is unlikely to further the interests of the accused. *See id.* at 31-32 ("[C]ompetent counsel could have knowingly and reasonably declined to raise the constitutional issue . . . because doing so would be a waste of the defense's time, energy and resources . . . and [the defendant's] interests would be best served by moving the trial along and focusing on the immediate task of jury selection."); *Morales*, 635 F.3d at 44-45 ("It would not be unreasonable for a defense attorney . . . to believe that [a defendant's] trial had been unaffected notwithstanding the public's absence."). The potential jurors in this high-profile trial were to be questioned about personal and potentially sensitive topics, including their views on and any prior experience with domestic violence. Under these circumstances, the trial court's finding that Roberts's trial counsel made a reasonable tactical decision to agree to the process of conducting certain aspects of voir dire in chambers cannot be seen as clearly erroneous. On the contrary, trial counsel's decision represented a thoughtful and practical strategic choice designed to elicit the most candid responses from potential jurors,

thus providing the defense team with the information it needed to select a jury in a manner that would best protect Roberts's interests.

[¶28]   Because we conclude that trial counsel's performance was not ineffective, we likewise conclude that appellate counsel did not provide ineffective assistance by failing to raise Roberts's Sixth Amendment claim on direct appeal. *See Morales*, 635 F.3d at 45.  Roberts has failed to show cause for failing to raise this issue on appeal; therefore, he cannot raise it now on post-conviction review.

B.     The Courthouse Screening Procedure

[¶29]   Roberts next contends that the prohibition on apparel displaying certain logos implicated his Sixth Amendment rights to such an extent that a new trial is constitutionally required.   Roberts argues that the screening process constituted at least a partial closure of the courtroom, which is only permissible if the trial court makes appropriate factual findings on the record.  The State argues that no closure occurred because no members of the public were excluded and that the restriction was a reasonable measure designed to protect Roberts's right to a fair trial.  We agree with the State.

[¶30]  In discussing the public's right to attend criminal trials, the United States Supreme Court has indicated that a trial judge may, "in the interest of the fair administration of justice, impose reasonable limitations on access to a trial," and that "[t]he question in a particular case is whether that control is exerted so as

not to deny or unwarrantedly abridge the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 n.18 (1980) (alterations omitted) (quotation marks omitted). Thus, not every restriction on entry to court proceedings constitutes a closure. *Commonwealth v. Maldonado*, 2 N.E.3d 145, 151-52 (Mass. 2014). Where there is an articulable risk of witness intimidation or courtroom disruption, or some other comparable reason, the imposition of conditions on entry to the courtroom is permissible so long as the conditions are "no broader than needed to accomplish their purpose." *Id.* at 154. Thus, for example, several jurisdictions have concluded that no constitutional closure occurs when spectators are required to provide identification prior to attending a trial. *See, e.g.*, *id.* at 153; *Williams v. State*, 690 N.E.2d 162, 168-69 (Ind. 1997) (establishing that a Sixth Amendment violation occurred requires "some showing that the court, by order or otherwise, physically prevented the public from attending"); *State v. Cross*, 771 N.W.2d 879, 882 (Minn. 2009) ("A voluntary decision by a member of the public to avoid courtroom security procedures designed merely to record the identities of persons attending a hearing does not constitute a 'closure' for purposes of the Sixth Amendment right to a public trial.").

[¶31] Here, the policy of prohibiting spectators from wearing certain types of apparel in the courthouse was justified by the trial court's concern for maintaining security and order in the courtroom, as well as its desire to shield the jury from prejudicial information about Roberts's associations that could compromise the fairness and integrity of the trial. The restriction was no broader than necessary to accomplish these purposes, *see Maldonado*, 2 N.E.3d at 154, as evidenced by the fact that only one spectator was affected but was ultimately permitted to enter the courthouse after agreeing to turn his shirt inside out.[4] The screening procedure represented a reasonable exercise of the court's ability to exert control over the courtroom, s*ee Richmond Newspapers, Inc.*, 448 U.S. at 581 n.18, especially in light of defense counsel's knowledge of and agreement to the measures. *See United States v. Acosta-Colon*, 741 F.3d 179, 187 (1st Cir. 2013) (declining to find a constitutional violation where counsel failed to object to trial court's decision to exclude a group of spectators wearing T-shirts expressing support for criminal defendant). Because the screening procedure constituted a reasonable condition on entry to the courtroom, it did not rise to the level of a constitutional closure.

---

[4] Roberts argues that the screening policy was enforced exclusively against his supporters. Although the record reflects that the only spectator affected by the policy was a Roberts supporter, there is nothing in the record to support the suggestion that the procedure was designed to exclude Roberts's friends and family, or that the judicial marshals enforced the policy only against Roberts supporters and not against members of the general public.

C.      Limitations on Entry to the Courtroom During Trial

[¶32]   Roberts further argues that the trial court's decision to prohibit members of the public from entering the courtroom during witness testimony constituted a partial closure unsupported by any appropriate findings.  Again, we conclude that no closure—and thus, no constitutional violation—occurred.

[¶33]  We reiterate that the Sixth Amendment does not prohibit a trial court from imposing reasonable limitations on the public's access to the courtroom. *See Richmond Newspapers, Inc.*, 448 U.S. at 581 n.18; *Maldonado*, 2 N.E.3d at 151-52.  Here, although certain members of the public were barred from entering the courtroom at certain times, they were not permanently excluded.  Moreover, the public at large was not excluded; anyone who was inside the courtroom, including family members and members of the press, was permitted to remain.[5] That some members of the public were unable or unwilling to arrive on time does

---

[5] We note that trial courts statewide and in other jurisdictions consistently take a similar approach to minimizing distractions in the courtroom during an essential part of any criminal trial—the reading of jury instructions.  Were we to accept Roberts's argument that precluding spectators from entering the courtroom during certain portions of the trial constitutes a closure within the meaning of the Sixth Amendment, we would be forced to conclude also that the longstanding and accepted practice of closing the courtroom doors while the jury is being charged violates the constitution.  Such a result is untenable and is not compelled by the Sixth Amendment's public trial guarantee.  *See, e.g., State v. Brown*, 815 N.W.2d 609, 617-18 (Minn. 2012) (rejecting argument that locking doors during jury instructions violated Sixth Amendment because "[t]he trial remained open to the public and press already in the courtroom and the trial court never ordered the removal of any member of the public, the press, or the defendant's family"); *Davidson v. State*, 591 So.2d 901, 903 (Ala. Crim. App. 1991) ("An order to lock the door for such an interval as to prevent disruption in the courtroom is properly a matter for the trial court's discretion and does not prevent a public trial in the sense of constitutional requirements."); *People v. Colon*, 521 N.E.2d 1075, 1079 (N.Y. 1988) ("Locking the doors during the charge to avoid disruption—allowing those already present to remain—does not seek to exclude the public or frustrate the salutary purposes of public scrutiny.").

not render the restriction on entry a closure for constitutional purposes. *See Cross*, 771 N.W.2d at 882. This is not a situation that raises concerns about a trial being conducted in secret. *See Press-Enterprise Co.*, 464 U.S. at 508 ("The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known."). Rather, the restriction on courtroom entry during witness testimony reflects the trial court's reasonable response to what the record reveals was an ongoing problem during the first few days of the trial. Here, the trial court raised the issue of spectators' distracting behavior with counsel at least twice and addressed the spectators directly about their conduct. It appears that only when these measures proved ineffective did the court resort to restricting courtroom access. Under these circumstances, the trial court's decision constituted a reasonable exercise of its power to control the proceedings and did not amount to a closure of constitutional dimensions. Accordingly, it did not affect Roberts's Sixth Amendment right to a public trial.

D.     The Return of the Verdict

[¶34] Finally, Roberts contends that the doors to the courthouse were locked before the jury returned its verdict, constituting a closure in violation of the Sixth Amendment. The post-conviction court found as fact that the doors were not

locked prior to the announcement of the verdict, and we review that finding only for clear error. *See McGowan v. State*, 2006 ME 16, ¶ 14, 894 A.2d 493; *see also Lamarre v. State*, 2013 ME 110, ¶ 14, 82 A.3d 845 (a post-conviction court's finding is clearly erroneous only if "there is no competent evidence in the record to support it" (quotation marks omitted)).

[¶35]   Contrary to Roberts's assertions, ample evidence supports the post-conviction court's finding that the courthouse doors were not locked until after the verdict had been announced.  The record reveals that the jury returned to the courtroom at 4:54 p.m. after it had completed its deliberations.  The record also contains evidence that the courthouse doors were typically locked at 5:00 p.m., and the evidence did not compel a finding that they were locked any earlier than usual on the day the verdict was reached.  Although several witnesses testified that they were unable to enter the courthouse when they arrived to hear the verdict, none of them could recall what time it was when they arrived.  The post-conviction court acted well within its prerogative as a fact-finder by concluding that the doors were locked at the usual time of 5:00 p.m. and that the public was not excluded from the announcement of the verdict.[6]  The post-conviction court properly concluded that Roberts's Sixth Amendment right to a public trial was not violated.

---

[6]  The record reflects that certain members of the press, as well as members of Mendoza's family, were escorted out of the courthouse sometime after the verdict was announced.  The post-conviction court also mentioned in its order that members of Roberts's family were present in the courtroom when the

The entry is:

Judgment affirmed.

---

**On the briefs:**

Rosemary Curran Scapicchio, Esq., Boston, Massachusetts, and Verne E. Paradie, Jr., Esq., Paradie Sherman Walker & Worden, Lewiston, for appellant Daniel Roberts

Janet T. Mills, Attorney General, and William R. Stokes, Dep. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Rosemary Curran Scapicchio, Esq., for appellant Daniel Roberts

Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

Androscoggin County Superior Court docket number CR-2009-685
FOR CLERK REFERENCE ONLY

---

verdict was read. This finding appears to be clearly erroneous, as uncontroverted testimony at the post-conviction review hearing indicated that Roberts's family members were among those unsuccessfully attempting to gain entry to hear the verdict. This apparent error is immaterial, however, because the presence or absence of Roberts's family members had no bearing on the court's finding that the doors were locked after the verdict had already been announced.