STATE OF MAINE                          SUPERIOR COURT
AROOSTOOK, ss                           DOCKET NO. CR-18-40877


ROBERT CRAIG                      )
              Petitioner          )
                                  )
                                  )
                                  )
vs                                )          DECISION
                                  )
                                  )
                                  )
STATE OF MAINE                    )
              Respondent          )


## INTRODUCTION

Pending before the court is Robert Craig's (hereafter "Craig") Petition for Post-Conviction Review. Hearing on the petition was held on October 18, 2021. Testimony was received from the Petitioner Robert Craig (hereafter "Craig") and Attorney Stephen Smith. Also admitted into evidence is Petitioner's Ex. 1 (Pet. Ex. 1), which is titled "Robert Craig- Outline of Claims". This was offered to also serve as Craig's amended petition. And also admitted into evidence were three (3) letters from Attorney Smith to Craig, to wit:

State Ex. 1- letter dated April 18, 2017;

State Ex. 2- letter dated May 19, 2017

State Ex. 3- letter dated June 7, 2017


With agreement of the parties, the record also includes, and the court has considered, the docket sheets and file contents of the underlying criminal charge and the transcript of trial

1

proceedings. (hereafter references to trial transcript are by volume and page number (T. V.__, p.__)).

## ISSUES IDENTIFIED

By an indictment dated September 9, 2016, Craig was charged with having committed on or about July 21, 2016 the intentional and knowing murder of Leo Corriveau (hereafter "Corriveau"). Trial was held in July, 2017. Craig raised self-defense during the trial. The jury was instructed on the elements of self-defense and the lesser included offense of manslaughter. The jury returned a verdict of guilty to murder, and Craig was sentenced to 33 years. At sentencing, counsel told the court Craig had authorized him to tell the court he would not be filing an appeal. (T. Sentencing Volume, p. 13).

In his initial handwritten petition dated August 9, 2018, 2018, Craig alleges ineffective assistance of counsel in that counsel failed to present mitigating evidence, impeach witnesses, other various deficiencies, and also failed to perfect an appeal. At hearing, and as identified in Craig's Outline of Claims, Craig focused his claims to counsel's failure to introduce evidence of Corriveau's history for violence and other bad acts that would have been relevant to Craig's state of mind. (See Pet. Ex. 1). The claims are numbered one through eleven in the Outline of Claims, and will be addressed by that numbering in this decision.

## STANDARD OF REVIEW

Claims of ineffective assistance of counsel raised on post-conviction review are governed by the two -part test outlined in *Strickland v. Washington,* 466 U.S. 668 (1984). Applying that test, a petitioner bears the burden, at the post-conviction trial, of proving the following: (1)

2

counsel's representation fell below an objective standard of reasonableness, and (2) the deficient representation resulted in prejudice. *Philbrook v. State,* 2017 ME 162, ¶ 6. The second prong of the test is also described as whether errors of counsel actually had an adverse effect on the defense. *Fahnley v. State,* 2018 ME 92, ¶17; *Hodgdon v. State,* 2021 ME 22, ¶11.

As to the first prong of the test, counsel's representation falls below the objective standard of reasonableness if it falls below what might be expected from an ordinary fallible attorney. *Philbrook,* ¶ 7. Judicial inquiry into the effectiveness is highly deferential, and the post-conviction court must make every effort to eliminate the distorting effects of hindsight. *Id.* Judicial inquiry into the effectiveness of representation is highly deferential, and the court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable conduct. *Watson v. State,* 2020 ME 51, ¶20. At the same time however, a determination that defense counsel's choices amount to trial strategy does not automatically insulate them from review. *Id.*

In *Roberts v. State of Maine,* 2014 ME 125, ¶23,103 A.3d 1031,1039, the Law Court indicated that in order to prove that counsel's performance was constitutionally deficient,

> "a defendant must show that counsel's representation fell below an objective standard of reasonableness. The question is whether the counsel's performance fell within the wide range of reasonable professional assistance that a competent criminal defense counsel could provide under prevailing professional norms. The *Strickland* test compels us to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." (Internal citations and punctuation omitted.)

As to the second prong, whether prejudice is established, a petitioner must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

3

proceeding would have been different, meaning that the ineffective assistance of counsel rose to the level of compromising the reliability of the conviction and undermining confidence in it. *Philbrook*, ¶ 8; citing *Theriault v. State*, 2015 ME 137, ¶¶ 19, 25. A conviction may be unreliable and not worthy of confidence, thus satisfying the reasonable probability test, even without proof that a different outcome was "more likely than not", as the now superseded "outcome determinative" test would require. *Id.* The "reasonable probability" test is different from an "outcome-determinative" standard, which is the quantitative inquiry that would require proof "that counsel's deficient conduct more likely than not altered the outcome in the case." *Theriault*, ¶20. Rather, the court's analysis must be qualitative in nature-that is to determine whether the petitioner has demonstrated that trial counsel's performance undermines confidence in the outcome of the case and renders that outcome unreliable. *Theriault*, ¶19. "..the result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Theriault*, ¶20, citing *Strickland*, 466 U.S., at 694.

More specific to this case, Craig is asserting that his counsel was ineffective to not introduce more evidence of prior events or prior conduct by the victim Leo Corriveau that Craig was aware of by the time of the incident. Craig raised self-defense. While evidence of a victim's character or bad acts is generally not admissible to prove that a person acted in conformity therewith, when an accused raises self-defense, a defendant's knowledge of prior acts of violence, whether witnessed by or recounted to the defendant, are not excluded by M.R.Evid 404, as the evidence serves to establish that the defendant's mental judgments and physical responses during the encounter were reasonable. *State v. Stanley*, 2000 ME 22, ¶ 8,9; *State v. Laferriere*, 2008 ME 67, ¶4.

4

DISCUSSION

Craig's primary assertion of ineffective counsel, as listed in his Outline of Claims, is counsel's failure to offer more evidence of Corriveau's prior acts of violence and bad character. Before addressing Craig's list of deficiencies as set forth in his Outline, it is first necessary to review some of the background of their relationship, and the event that caused Corriveau's death. The following is a summary of that background and the event that caused Corriveau's death as testified to by Craig:

Craig and Corriveau had become friends while both wintered in Florida. Both were in their 80's. When Corriveau was preparing to return to Maine for the summer of 2016, he invited Craig to join him. Craig described Corriveau as being a good friend. Craig accepted the invitation and drove with Corriveau back to Maine. Craig stayed with Corriveau at Corriveau's home in Presque Isle for approximately 20 days. During that time, they spent their days enjoying meals together, doing chores and work around the yard of Corriveau's home, and visiting about the community. Craig has described it as being a nice visit. But after 20 days, Craig was ready to return to Florida. And his accepting the invitation to come to Maine was with the understanding Corriveau would help him get back to Florida.

Craig has not asserted in either his trial or post-conviction review testimony that Corriveau was ever violent towards him when they were in Florida, or during the first 20 days together in Maine. But through his testimony, Craig has described Corriveau as a "a little goofy" and that his moods could swing quickly. After being in Maine for 20 days,

5

Craig told Corriveau he had had a nice visit but was ready to go back to Florida. Corriveau told Craig "there's the door". Craig asserts Corriveau became angry that he wanted to leave, and that he failed to assist him make any arrangements to return. This behavior scared Craig. Over the next two days Corriveau's mood and demeanor changed back and forth, from angry to cooperative. Craig testified he had never before seen this side of Corriveau, and was scared he wasn't going to be able to leave.

On the day of the altercation, two days after Craig had announced he was ready to go home, the two were completing some yard work near the pond in Corriveau's back yard. In discussing what they had accomplished that day, Corriveau mentioned tasks he wanted them to complete the next day. When Craig reminded Corriveau he was leaving the next day, Corriveau angrily shouted "enough", and grabbed Craig's wrist. Craig in turn grabbed Corriveau's wrist. Neither let go and they both tumbled to the ground. Craig testified Corriveau was repeatedly hitting and kicking him while both were on the ground, and he was having difficulty breathing, so he grabbed Corriveau around the Adam's apple area of his throat and did not let go until Corriveau stopped moving.

Trial counsel met with Craig several times in advance to prepare for trial. In fact, Craig testified at the hearing that counsel spent a lot of time with him and he was pleased with the frequency of visits. Counsel memorialized his meetings with Craig reminding Craig of their strategy. (See State Ex's. 1, 2 and 3). Those letters make clear the agreed upon strategy was for Craig to testify on his own behalf, self-defense would be asserted, and that they would stay away from attacking Corriveau's character. (Id.) In the letter dated June 7, 2017, counsel wrote to Craig *"I want to repeat some basic rules: 1. Do not talk ill of Leo. In other words, do not speak*

6

*ill of the dead."* (State's Ex. 3). Counsel testified at hearing that he gave this advice because it has been his experience that "trashing" the deceased is not a wise tactic. Counsel indicated he believed Craig was fully on board with the strategy. Counsel also testified that through his discussions with Craig he was familiar with most of the items listed in Craig's Outline of Claims (Pet. Ex 1), but felt many of them were simply not relevant to his claim of self-defense. This seems consistent with advise counsel gave in his letter to counsel dated May 19, 2017- *"We will stay away from attacking Leo's character generally except to the extent it affected your fear of him physically."* (State's Ex. 2). This advice is consistent with the law Court's rulings discussed above that a defendant's knowledge of prior acts of violence, whether witnessed by or recounted to the defendant, are not excluded by M.R.Evid 404, as the evidence serves to establish that the defendant's mental judgments and physical responses during the encounter were reasonable. *State v. Stanley,* 2000 ME 22, ¶ 8,9; *State v. Laferriere,* 2008 ME 67, ¶4.

The court will now discuss the claims made by Craig in his Outline of Claims. (Craig's assertions in his outline being italicized)

1. *Never impeached Leo's character.*

    a. *Leo was a middleman, and handled large sums of money*-the court fails to see any relevance as it does not relate to violence.

    b., c., and d. *Leo had a short fuse, never brought up anything negative about Leo, no negative evidence about Leo's temper*- at trial, Craig testified that in the last two days, Corriveau's mood and behavior was erratic, back and forth between angry and cooperative, that he had never seen Corriveau like this before, and that he was scared. (T. V. 2, pp. 90-94; V. 3, p. 13).

7

*e. no evidence Leo was in and out of VA hospital-* Craig testified at hearing he became aware of this after Corriveau's death.

*f. no evidence that Leo didn't get along with his family because he was mean-*the court does not believe this would be relevant as it does not relate to violence; but not withstanding that Craig did testify that Corriveau did not have a relationship with his children. (T. V 3, p. 40).

*g. Leo had protection orders taken out against him in the past-* this assertion was not developed sufficiently at hearing; the only testimony at hearing regarding protection orders was Craig's testimony that Corriveau had gotten restraining orders against his sons.

*h. Leo had a long criminal history and was a felon(but had guns)-* Craig testified at hearing he did not know about Corriveau's criminal record until after the event. Craig did testify at trial that Corriveau possessed a gun but he never threatened him with it in anyway. (T. V. 2, pp. 105-106).

*i. Leo was a womanizer and accused of rape at gunpoint-* this could arguably be an act of violence, but relevance remains questionable and also Rule 403 implications; otherwise Craig did testify at trial before objections were made that Corriveau was a bit of a womanizer. (T. V.2, p. 85).

*j. Leo was mean-* in general, does not go to knowledge of violence. Craig did however testify at trial to how erratic and mean Corriveau was acting in the two days before the event.

*k. a month before, there was a rumor that someone had called the police to get away from Leo-* this event apparently also involved a woman, so relevance is not certain. Counsel indicated the defense did try to confirm this rumor to no avail.

*l. and m. Leo had two woman(daughters) taken away, Leo drugged his two daughters and had sex with them-* Craig testified he learned these matters after the event, while he was in jail

8

awaiting trial. The court cannot discern how this evidence would be relevant to Craig's state of mind relative to self-defense.

*n. Leo's wife was still living-* not relevant to Craig's state of mind relative to self-defense.

*o. and p. Leo was not nice to his Philippine wife, Leo was married three times-* not relevant.

*q. Leo held a woman at gunpoint-* this is arguably an act of violence, but still questionable of impact to Craig's state of mind as entirely different context, and has Rule 403 implications.

*r. Leo's 2nd wife lived in Clearwater-* not relevant.

*s. Leo wanted to drive fast-* fast driving would not be relevant, but Craig did testify at trial to Corriveau driving 100 mph the morning of the day of the event. (T. V. 2, p. 99).

*t., u. and v. Leo's use of "speed" or "pep pills"-* not established in anyway how relevant to the events which caused Corriveau's death, or to Craig's state of mind relative to self-defense.

*w. Leo not tipping at restaurants-* not relevant to self-defense.

*x. Counsel lead Robert to believe all of the above evidence about Leo would be presented to the jury-* see State's Ex's. 1, 2 and 3 which established the strategy developed.

In summary, the court finds counsel effectively questioned Craig at trial about Corriveau's anger, erratic behavior, and mood swings in the two days leading up to the event. Otherwise, most of the matters raised by Craig in section 1 of his Outline were either adequately raised at trial, or not relevant, or in many cases, matters Craig learned of after the event.

*2. Didn't introduce evidence about Robert's productive life (a. through h.)-* there is no dispute these particular aspects of Craig's personal history were not introduced to the jury. Counsel

9

testified at hearing however that efforts are always taken to humanize the defendant. In this case, counsel introduced Craig and humanized him by eliciting testimony about his background, age, school, where from, work experience, and why he moved to Florida. Counsel testified Craig is a very likeable, talkative person, and this most likely came through in his presentation at trial.

*3. Concerning cause of death, Robert was cutting weeds on side of hill and Leo complained about how bad a job he did.*

*a. Could have drowned him when he was working on the dock if killing him was really on his mind-* the court does not understand the complaint being made by Craig. As best as the court can discern, Craig may be arguing counsel should have raised this subtlety during closing arguments. Through the course of the trial, self-defense was clearly raised. And through Craig's testimony, there was ample evidence of Craig's assertions that Corriveau had become angry when he stated he wanted to return to Florida, and that Corriveau was using him to help with the yard work.

*b. Never accounted for the money Robert had. Made it look like a robbery, when Robert actually had $900 in cash, $300 in bank, and $1,000 on credit card.*

This assertion is entirely inconsistent with Craig's testimony at trial where he gave a detailed explanation of the money. At trial, Craig testified Leo gave him $300 for transportation back to Florida and $100 for food, and that he had $50 to $150 on him. (T. V. 2, p. 95.). He also testified he had some money in the bank, which was Bank of America, but because there were no Bank of America branches in the area that money was not helpful. (Id.) Finally, on re-direct examination, Craig explained he would be receiving his social security check soon after he returned to Florida, so he had enough money. (T. V. 3, p. 46). Accordingly, the court finds counsel appropriately addressed the point that Craig did not rob Corriveau.

10

*4. Smith never brought up he was trained and taught to defend himself, Florida was a stand your ground state…*

The court is not swayed this evidence is relevant, and potentially implicates Rule 403. To the extent this evidence is admissible, the court fails to see how it would have had much impact on the case. The court does not believe counsel's failure to raise this evidence results in his representation falling below an objective standard of reasonableness, or that it had an adverse effect on the defense.

*5. State claimed I walked down to the pond, choked Leo to death, took his wallet, took his car, and had a lobster dinner.* Counsel effectively questioned Craig on his version of the events.

*a. and b. The jury should have heard Robert was a "trapped" guest in Leo's house; that Robert was "kept" in Leo's home for over 20 days with no way to get home-* counsel effectively questioned Craig at trial about the circumstances resulting in Craig accompanying Corriveau to Maine, what they did for the first 20 days in Maine, that Corriveau became angry when he stated it was time to go home, and the details of how Corriveau acted in the two days thereafter leading up to the event including Corriveau not helping Craig make arrangements to leave. (T. V. 2, pp. 85-101). Craig specifically testified to being scared and upset that he wasn't able to leave. (Id. p. 93-94). Craig testified "I was very upset, shook up, and I'm realizing that instead of him helping me get out of the area, he's keeping me in the area." (Id. at p. 94).

Craig's assertion that counsel was not effective in presenting this topic fails.

*c., and d. Leo learned his brother-in-law had died, this affected his mood. It could have been Leo's way out.* – this evidence was not generated at the post-conviction hearing, and the court otherwise fails to see how this evidence would have had any impact on the defense. The defense

11

already included ample evidence of Corriveau's anger and mood swings in the two days prior to the event.

*e. Reports said Robert would not leave and was lazy-* same finding as set forth in section 5 a. and b.

*f. "Fuck Leo" jail call comment-* the court fails to see what, if anything, counsel could have done about statements Craig made on recorded telephone lines from the jail.

*6. State claimed Robert grabbed Leo's wrist, but Robert has no balance. Should have hired a Dr. or expert on Robert's balance issue.*

At trial, counsel lead Craig through a reconstruction of the events in the backyard which resulted in Corriveau's death. (T. V. 2, pp. 115 -131 The jury witnessed first hand the difficulty Craig had in moving, and especially getting up from the floor. In fact, counsel told the court at side bar that demonstrating Craig's difficulties in moving was his objective. (Id.at pp. 119-125). An expert was not necessary to establish with the jury the significant difficulties Craig, an 80 year old man who weighed nearly 300 pounds, had in moving about and getting up. At the same time, the court notes that the defense did retain and call as a witness Dr. Jonathan Arden, a forensic pathologist. Dr. Arden testified for the defense that the injuries sustained are consistent with the description of the event given by Craig, i.e. that he acted in self-defense. (T. V. 2, pp. 53-77). The court does not believe counsel's efforts in this topic area fell below an objective standard of reasonableness, or that it had an adverse effect on the defense.

12

*7. State claimed that Leo fell on thick grass and this caused facial mark. Not pausible.(sic) Should have been refuted.*

This topic was refuted by the defense. In addition to Craig's testimony at trial about the event, Dr Arden was also questioned about the facial injuries. Dr Arden described Corriveau's facial injury as not severe and that it could have been caused by his glasses when he fell to the ground. (T. V. 2, pp. 59-60).

*8. Smith should have emphasized that Robert weighed 338 pounds when the event happened, has heart issues, salt free diet and water pills.*

Craig's weight and health issues were all sufficiently developed at trial.

*9. Smith should have raised about breaking Leo's glasses.*

This was developed at trial, including through the testimony of Dr. Arden, discussed in section 7, infra.

*10. Smith never objected to anything at trial.*

Craig has failed to identify or specify what objections were missed or what evidence was improperly admitted.

*11. Robert called is(sic) Sister in Law and Niece about stopping and seeing them on the way back to Florida before Leo died.*

This topic was not developed at the post-conviction hearing. The court infers that his would establish Craig's returned to Florida was planned. At trial, Craig testified at length that after 20 days in Maine, his plan was to return to Florida, and that is when Corriveau became angry. The court does not believe counsel's failure to raise this evidence results in his representation falling below an objective standard of reasonableness.

13

In summary, Craig has failed to meet his burden of establishing either that (1) counsel's representation fell below an objective standard of reasonableness, or (2) the deficient representation resulted in prejudice. *Philbrook v. State,* 2017 ME 162, ¶ 6. As to not filing an appeal, Craig appears to have waived that argument, it not being mentioned in his Outline of Claims or discussed at the post-conviction hearing. Notwithstanding, the court is satisfied by counsel's representation at sentencing that Craig had authorized counsel to tell the court he would not be appealing the verdict. (T. Sentencing Volume, p. 13).

The entry is:

Petitioner Robert Craig's petition for post-conviction relief is DENIED.

Dated: _10/27_, 2021

_____
Justice, Superior Court

14